DUNNEBACKE COMPANY, Plaintiff and Respondent, vs. PITTMAN, Defendant and Respondent, GILLIGAN and wife, Defendants and Appellants.

*October 11—November 6, 1934.*

For the appellants there was a brief by *S. J. Konenkamp* of Chicago, Illinois, attorney, and *R. V. Baker, Jr.,* of Kenosha of counsel, and oral argument by *Mr. Konenkamp.*

For the respondent Pittman there was a brief by *Harold A. Konnak,* attorney, and *Lawrence H. Smith* of counsel, both of Racine, and oral argument by *Mr. Konnak.*

NELSON, J. Although numerous attacks are made upon the judgment herein we find it necessary to discuss but one question, since, in our view, the determination of that question must result in a reversal of the judgment and a dismissal of the cross-complaint.

Did the court err in permitting Pittman to recover from the defendants Gilligan upon *quasi*-contract for work performed and materials furnished by him in erecting a breakwater upon certain premises belonging to defendant Lena B. Gilligan?

It is necessary that the material facts be stated. The defendants Gilligan were residents of Chicago. Mrs. Gilligan taught school there. She owned a parcel of real estate in Kenosha county which abutted upon Lake Michigan. It extended about one hundred and forty feet along the lake. The side of the property which sloped abruptly toward the lake was subject to erosion. The defendant Pittman was a local contractor. Prior to the fall of 1932 he had been employed at various times by the Gilligans to perform small jobs in and upon the premises. One of such jobs was the erection of a concrete wall across the slope of the bank for the purpose of protecting it from erosion. That wall as constructed did not extend very far into the soil and the Gilligans feared that it might give way and fall down unless it was in some manner protected. The Gilligans talked to Pittman at different times about building another wall to protect it. In the spring of 1932 the Gilligans and Pittman met on the beach of the property and at that time discussed what could be done to protect the existing wall. Mr. Pittman testified that at that conference Mrs. Gilligan stated that she would like to put in a wall to protect the first wall; that at that time she walked out to the water's edge, extended her arms and indicated where the wall which she had in mind should be located; that she asked him whether

it should run straight along the bank parallel with the water's edge; that he expressed the opinion that it should not, but should be constructed in the form of a V; that he marked a point near the water's edge to which the end of the proposed wall should reach; that he told her it was his opinion that the structure should be seven feet high, four feet thick at the bottom and three or three and a half feet thick at the top; that he told Mrs. Gilligan it would cost her twenty-five cents per cubic foot; and that Mrs. Gilligan told him to go ahead and get it in as quickly as he could.

Mrs. Gilligan testified that in the spring of 1932 she discussed with Mr. Pittman the advisability of constructing a wall; that she then told him that she would like to have something constructed about twelve feet in front of the existing wall that would extend into the soil four feet and be level with the bank, for the purpose of protecting the first wall; that she asked him to give her a figure on it and that he promised to do so; that she talked about a wall which would extend across the bank, parallel with the first wall and that Pittman suggested a V-shaped wall; that Mr. Pittman judged that the wall proposed by him would be about forty feet from the ends of the old wall to the apex of the triangle; that she asked him how much that would cost; that he said he didn't just know, but that he would figure it up and let her know. She further testified that during the summer of 1932 several other conversations regarding the proposed wall were had; that she saw Mr. Pittman upon the property on September 25th and talked to him about finishing up the different jobs that he had not completed; that she never gave Mr. Pittman orders to go ahead with the construction of the V-shaped wall, but told him to go ahead and finish the things that he had already begun; that thereafter she and her husband went back to Chicago and did not again visit the property until two weeks later, when she discovered that Mr.

Pittman had erected a massive V-shaped wall extending from the bank across the beach, a distance of about fifty feet, to the water's edge (the wall is about seven feet high, four feet thick at the bottom and about three feet thick at the top); that upon discovering the wall she was greatly excited because she had never given him any orders to build it; that she told him that the structure was a monstrosity, and that she wanted it removed from her property; that after a heated discussion he told her that if she would pay his workmen he would blow the damn thing into the lake; that she told him to go ahead and do it as it didn't do her any good. The testimony of Mrs. Gilligan was in all respects corroborated by her husband. The breakwater, as constructed, completely blocked travel along the beach and made it impossible to go from one side of the property to the other along the beach without stepping into the water. Testimony was adduced to show that the structure as completed was a benefit to the property, and also to the effect that the erection of the wall had greatly damaged it.

At the conclusion of the testimony the court said:

"I do not think I can find under the evidence here that the minds of these parties ever met on this subject, there was never more than a discussion about it. I do not believe the plaintiff was warranted in doing the work he did there. That is the way it impresses me. In important work like this the minds of the parties certainly should meet as to what it is to be and the payments and everything. It illustrates a careless way of doing business, that is what it is, very careless. I cannot see how a contractor would go ahead and do a piece of work like this without having something more, something to show for it. It seems he did it. I cannot imagine why he did it if he did not suppose he was doing what he should do. But the evidence is not satisfactory. The burden is on them to show that there was a contract entered into here with the owner of the property as to what it was to be."

Pittman's attorney thereupon asked leave to amend the cross-complaint to conform to the proof so that it would state a cause of action based upon the theory of unjust enrichment. Some discussion followed after which the court inquired as to the nature of the proposed amendment; whereupon Pittman's attorney said:

"I would have to amend the answer and cross-complaint of the defendant Pittman to state a cause of action sounding in implied contract and unjust enrichment; that the work which was performed on the Gilligan property was performed in good faith by the defendant Pittman as the result of mutual mistake, resulting in an improvement to the property; and that if he is not compensated therefor on the basis of *quantum meruit,* reasonable cost, the defendant Gilligan will be unjustly enriched."

After further discussion the court allowed the amendment. The court said:

"These parties had business dealings with one another, and it is undisputed that they talked about some improvement of this kind being made. The mistake is that the defendant went ahead with this great expense without getting specification and contract, of course, as it should have been done; but it cannot be said that he did not go in there and make all of this expenditure in good faith."

It is apparent that when the defendant Pittman moved to amend his cross-complaint so that it would state a cause of action based on unjust enrichment, the law of *quasi-*contracts upon which he relied was not precisely appreciated. However, the amendment was allowed, and, upon the findings of fact thereafter made, the court concluded as follows:

"First: That the property of the defendants Lena B. Gilligan and Joseph J. Gilligan, her husband, was enriched and its value enhanced by the work, labor and material furnished by the defendant, C. H. Pittman, and that the defendants Lena B. Gilligan and Joseph J. Gilligan, her husband, in equity and good conscience ought not to be allowed

to enrich themselves unjustly at the expense of the defendant, C. H. Pittman."

From this conclusion of law it clearly appears that the court permitted a recovery, not on the theory that either an express or implied contract had been proven, but because in its opinion the Gilligans had been unjustly enriched at the expense of the defendant Pittman. The real question therefore is whether the judgment entered may be upheld under the law of *quasi*-contracts.

Actions arising in the field of *quasi*-contracts have been referred to as equitable in character. *Western Assurance Co. v. Towle,* 65 Wis. 247, 26 N. W. 104. They are, however, legal actions though ruled by equitable principles. *County of Sheboygan v. City of Sheboygan,* 209 Wis. 452, 245 N. W. 87; *Richland County Bank v. Joint School District,* 213 Wis. 178, 250 N. W. 407. *Quasi*-contracts "are legal obligations rather than equitable in the sense that they originated in the courts of law and are enforced by means of so-called legal as distinguished from equitable remedies." They rest "solely upon the universally recognized moral obligation of one who has received a benefit, the retention of which would be unjust, to make restitution." Woodward, The Law of *Quasi* Contracts, p. 8, § 6 (4). *Quasi*-contracts so-called "are in no sense genuine contracts." *Grossbier v. Chicago, St. P., M. & O. R. Co.* 173 Wis. 503, 181 N. W. 746; *Miller v. Schloss,* 218 N. Y. 400, 113 N. E. 337. "In order to establish the existence of a *quasi*-contractual obligation it must be shown, (1) that the defendant has received a benefit from the plaintiff, (2) that the retention of the benefit by the defendant is inequitable." Woodward, *supra,* p. 9, § 7; *Richland County Bank v. Joint School District, supra.*

In this case, although the court found that the property was benefited, it appears that the breakwater was constructed

during the absence of the Gilligans; that they had not contracted with Pittman to build it; that they had never contemplated building that kind of a structure; that they did not desire to retain it, but insisted rather that it should be removed from the property. The only sense in which it may be said that the Gilligans are retaining the breakwater is that it continues to exist upon the property against their will. It therefore appears that there is no unjust or inequitable retention of a benefit by them. Had the Gilligans been present during the time that the construction work was going on, and had they made no protest, we should have a different situation with which to deal. If, after the breakwater was constructed, the Gilligans had in some manner manifested an intention to retain it, a recovery on the basis of *quasi*-contract might be sustained. It is our opinion that neither the evidence, the findings of fact, nor the conclusions of law sustain a recovery based on the law of *quasi*-contracts. The judgment in favor of C. H. Pittman against the defendants Gilligan must therefore be reversed and the amended cross-complaint dismissed. So much of the judgment as permits a recovery by the Dunnebacke Company against the defendant C. H. Pittman on its account for merchandise sold and delivered by it to him, from which no appeal was taken, is not disturbed.

Little, if any, consideration was given to the counter-claim interposed by the defendants Gilligan for the apparent reason that the court was of the opinion that the premises had been benefited rather than damaged by the construction of the breakwater. The counter-claim was not dismissed or specifically dealt with. The effect of the judgment, however, is to deny recovery by defendants Gilligan on their counter-claim. Under the course which the trial took we are of the opinion that the counter-claim should be dismissed without prejudice to the right of Mrs. Gilligan again to assert a claim for damages against Pittman should he fail or

refuse upon demand to remove the breakwater and should she have it removed.

*By the Court.*—The judgment in favor of C. H. Pittman and against Joseph J. Gilligan and Lena B. Gilligan is reversed, with directions to dismiss the cross-complaint as amended.

The counter-claim of Joseph J. Gilligan and Lena B. Gilligan is dismissed without prejudice.

FRITZ, J., dissents.