NELSON, Appellant, vs. PRESTON, Respondent.*

*November 5—December 2, 1952.*

* Motion for rehearing denied, with $25 costs, on February 3, 1953.

*Clayton A. Cramer of* Waukesha, for the appellant.

For the respondent the cause was submitted on the brief of *Thomas P. Maroney,* attorney, and *Wallace D. Tingley* of counsel, both of Milwaukee.

FAIRCHILD, J.   In view of the determination of the **trial** court and the finding of the nonexistence of an **agency,** the question turns upon the right of the appellant to have been permitted to amend his pleadings to prove unjust enrichment and "implied" or quasi contract. Quasi contracts are "a class of obligations which are imposed or created by law

without regard to the assent of the party bound, on the ground that they are dictated by reason and justice, . . . and the obligation arises not from consent, . . . but from the law or natural equity. Such contracts rest on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another, . . . In order that a contract may be implied in law from the wrong of a party, it must have been committed with the intention of benefiting his own estate." 17 C. J. S., Contracts, p. 323, sec. 6. As stated in *Dunnebacke Co. v. Pittman,* 216 Wis. 305, 257 N. W. 30, the essential elements of quasi contract entitling one to judgment for unjust enrichment are:

1. A benefit conferred upon the defendant by the plaintiff;
2. Appreciation by the defendant of the fact of such benefit;
3. Acceptance and retention by the defendant of such benefit, under circumstances such that it would be inequitable to retain the benefit without payment of the value thereof.

The respondent was the owner of a tract of land which had been subdivided and which is referred to under the name of Mill Valley Heights Subdivision. She and her son, Franklyn Preston, lived together. Their home was adjacent to the subdivision, within "eyeshot" of the construction project. Each, the mother and the son, was interested in the development of the Mill Valley Heights Subdivision. The evidence shows the development of a plan by the mother and the son under which houses were to be built on vacant lots in the subdivision. The title to the real estate was to remain in the respondent. When any given house was sold, she was to transfer title to the land on which it was built and receive a predetermined price for the lot. To carry on the development she financed her son partly from her own funds and especially through mortgages to secure loans to pay construction bills. She testified that loans advanced by her were to Preston Builders, and that "No note was given me by Preston Build-

ers to support any loan." However, in the three cases on which evidence was received concerning loans made by respondent from the National Savings & Loan Association, it is shown that the money borrowed by respondent was paid out to various contractors on orders signed by Mary S. Preston personally, such signature being required by the loan association on forms furnished by it. The entire proceeds of these three loans were disbursed to pay materialmen, the only exceptions being two orders to Frank Preston, one in the amount of $49.56, and one in the amount of $22.02, both of which amounts were apparently reapplied to the mortgage. Outside of these two orders no other orders were drawn on these loans to Franklyn Preston by Mary Preston.

Respondent testified that she had nothing to do with the building of the homes and knew nothing about it. Yet the applications made to the National Savings & Loan Association were signed by Mary S. Preston alone and described in detail the type of construction to be placed on each particular property. The note accompanying the mortgage in each case was signed by Mary S. Preston and Franklyn Preston as comakers. The certificates and assignments of stock certificates were signed by Mary S. Preston.

There is no question but that the appellant did perform labor and furnish plumbing materials and supplies in connection with eight of the houses erected on such tract referred to as jobs (houses) Nos. 19, 18, 17, 16, 15, 14, 11, and 8. On December 3, 1949, after appellant had finished his work on house No. 16, he went to the Preston home and presented a bill made out to Mary S. Preston. Respondent's testimony is to the effect that Mr. Nelson came outside and Franklyn was there. Franklyn came in and asked her if she could loan some money to Preston Builders to pay a bill to Mr. Nelson. That was the first time she knew Mr. Nelson was doing plumbing work there. At the time she first learned of the fact that he was doing plumbing work in that subdivision, she did not tell Mr. Nelson anything about her re-

lationship to Preston Builders. A check for the amount of appellant's bill was made out by Mary Preston to Preston Builders and indorsed by Franklyn Preston to appellant. Subsequently, appellant supplied additional services and materials to the subdivision project.

Respondent testified that in the spring of 1950 she took over houses 16, 19, and 18, as well as several unfinished houses on School drive, and that "Mr. Nelson's work was before I took over houses 16 and 19." Respondent claims that she now owns both house and lot No. 16. She also claims that she now owns house No. 19; and that she took over No. 18 early in the spring of 1950 under the same situation as the other two; and that she took over all the houses that were unfinished on School drive as of the spring of 1950, the same as the other three. Respondent admits that no papers were signed whereby she took over the houses. It is apparent that none were needed because she at all times had record title to the property.

When asked "Isn't it a fact that the purpose of the entire arrangement between you and Franklyn and Preston Builders was that this land was to be improved, and by the improvements you would receive substantially more for the lots?" she answered: "The lots would sell for more if there were a lot of buildings around." She also testified: "I would have sense enough to know plumbing work had to go in the houses before they were done." She further testified: "I am to receive the entire proceeds of the sale of any of those houses [the ones she took over]. If there is a profit I am to get it."

The evidence shows conclusively that the essential elements of quasi contract entitling one to a judgment for unjust enrichment exist. A benefit was conferred upon the respondent by the appellant in furnishing labor and material which entered into the construction of the buildings. The respondent had an appreciation of the fact that such benefits existed.

And the evidence shows her determination to accept and retain the benefits thus conferred under such circumstances that it would be inequitable to permit her to retain the benefits without payment of the value thereof. *Dunnebacke Co. v. Pittman, supra.*

Inasmuch as we are of the opinion that a quasi contract exists under the circumstances, there must be a reversal of the judgment as entered and also a reversal of the order, thus permitting the appellant to pursue his cause under the theory of unjust enrichment, and he must be entitled to a judgment awarding the damages claimed by him, because otherwise there would result unjust enrichment to the respondent. We have outlined the necessary material facts. The general principle which controls this situation is expressed in an opinion by Mr. Justice COLLIN in *Miller v. Schloss,* 218 N. Y. 400, 407, 113 N. E. 337, and quoted with approval by Mr. Justice JONES in *Grossbier v. Chicago, St. P., M. & O. R. Co.* 173 Wis. 503, 508, 181 N. W. 746, as follows:

"A quasi or constructive contract rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. In truth it is not a contract or promise at all. It is an obligation which the law creates, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it, and which *ex aequo et bono* belongs to another. Duty, and not a promise or agreement or intention of the person sought to be charged, defines it. It is fictitiously deemed contractual, in order to fit the cause of action to the contractual remedy." See also *Dunnebacke Co. v. Pittman, supra; Graf v. Neith Co-op. Dairy Products Asso.* 216 Wis. 519, 257 N. W. 618.

The evidence adduced upon the trial did not satisfy the trial court that the degree of exactness on which the terms of an agreement of agency could be found, and it was there-

fore decided below that no contract or relation of agency was expressly provided and no apparent agency existed. However, the evidence does show that in connection with the plan of improving respondent's property a relation did exist between the mother and the son under which services and material procured by the son from the appellant were to go into her property and to become of benefit to her. At the close of the case, with this evidence before it, the court refused to permit the appellant to amend his complaint to conform to the proof and to have judgment on the basis of unjust enrichment to the amount of services and material furnished by the appellant. It is considered that this ruling was erroneous and an abuse of discretion on the part of the trial judge. He expressly excluded from his consideration the matter of unjust enrichment, and granted judgment dismissing the complaint. Because of this ruling the appellant was deprived of a judgment which the record shows he was entitled to.

This action was begun in good faith, and facts sufficient to constitute a good cause of action were pleaded. When the evidence was in, the court had a record before it clearly showing that appellant was entitled to relief by way of damages. Therefore the dismissal of the complaint by the trial court was contrary to the rights of the appellant. *Clark v. Sloan,* 215 Wis. 423, 431, 254 N. W. 653; *Lipinski v. Lipinski,* 261 Wis. 327, 52 N. W. (2d) 922. A mistaken remedy does not necessarily require dismissal of an action. Sec. 269.52, Stats., provides that in all cases after trial, if it shall appear to the court that a party claiming affirmative relief of damages has mistaken his remedy, his action "shall not be finally dismissed . . . , but costs shall be awarded against him and he shall be allowed a reasonable time within which to amend. . . ." However, in the instant case no additional time was required to enable appellant to amend, because appellant had promptly made such motion to amend, and all the proof re-

quired to establish the cause of action pleaded in the amended complaint was already in the record.

The judgment must be reversed and cause remanded with direction to enter judgment in accordance with the demand as stated in the complaint.

*By the Court.*—Judgment and order reversed and cause remanded with directions to enter judgment in favor of appellant for the amount demanded in the appellant's complaint, with costs on this appeal in favor of the appellant, and costs of the trial below to be assessed against appellant.