FEDERAL INSURANCE COMPANY,
Plaintiff

v.

MAINE YANKEE ATOMIC POWER
COMPANY, Defendant

No. 00–307–P–H.

United States District Court,
D. Maine.

Nov. 21, 2001.

Gerald F. Petruccelli, Esq., Petruccelli & Martin, Portland, ME, Michael R. Lastowski, Esq., Duane, Morris & Heckscher, LLP, Wilmington, DE, Stephen A. Stallings, Esq., Henry A.H. Rosenzweig, Esq., Scott D. St. Marie, Esq., Sacks Montgomery, New York City, for Plaintiff.

William J. Kayatta, Jr., Esq., Jared S. Des Rosiers, Esq., Deborah L. Shaw, Esq., Pierce, Atwood, Portland, ME, Theodore J. Tacconelli, Esq., Michael B. Joseph, Esq., Ferry & Joseph, P.A., Wilmington, DE, Joseph D. Fay, Esq., Maine Yankee General Counsel, Wiscasset, ME, for Defendant.

## MEMORANDUM DECISION AND ORDER ON STIPULATED RECORD

HORNBY, Chief Judge.

This lawsuit contains a claim for unjust enrichment. Maine Yankee Atomic Power Company ("Maine Yankee") maintains that Federal Insurance Company ("Federal Insurance") was unjustly enriched when Maine Yankee paid approximately $12 million to subcontractors and suppliers that Federal Insurance otherwise would have had to pay as surety under a *payment* bond. As a result, Maine Yankee seeks restitution from Federal Insurance. Federal Insurance concedes that there may have been some "enrichment"—*i.e.*, that its obligation to pay subcontractors and suppliers may have been reduced in some amount by Maine Yankee's actions. But it denies that any enrichment was unjust. Pointing to contractual documents covering the transactions, Federal Insurance argues that the parties voluntarily structured their relationship and should live with the documented structuring, not turn to principles of unjust enrichment.

Maine Yankee also claims a statutory unfair claims settlement practice based upon Federal Insurance's rejection of Maine Yankee's *performance* bond claim. This claim raises the question how Maine's unfair claims settlement practices statute applies to suretyship contracts.

I conclude that restitution for unjust enrichment is appropriate, but that Maine's penalty statute for unfair claims settlement practices does not apply to the performance bond claim.

### I. PROCEDURAL CONTEXT

As a result of a trial management conference (called when the parties estimated a four to six week jury trial on mind-numbing construction issues involving performance and payment bonds), the parties stipulated to certain facts so as to obtain binding judicial rulings and thereby significantly reduce the number of trial days. They formulated two issues for me to decide without a jury:

(1) Is Maine Yankee entitled under the doctrine of equitable subrogation to assert claims against Federal Insurance under the payment bond—

(2) Is Maine's Unfair Claims Settlement Practices Act, 24–A M.R.S.A. § 2436–A, applicable to the surety relationship that existed between Federal Insurance and Maine Yan-

kee— If so, did Federal Insurance violate subsection (1)(A) of the Act by claiming that the performance bond required notice of any default—

## II. STIPULATED FACTS

Maine Yankee decided to decommission its nuclear power plant in Wiscasset, Maine. In 1998, it engaged Stone and Webster Engineering Corporation ("SWEC") to carry out the project, a contract covering five and one-half years, with a price tag of over $250 million. Joint Stipulation of Facts ("Jt.Stip.") Ex. 1 (Appendix C). One of the contractual requirements was that SWEC procure performance and payment bonds, each in the amount of 15% of the contract price. *Id.* at ¶ 24A.2. SWEC obtained the bonds from Federal Insurance, each in the amount of about $38 million.[1]

Problems on the project began to occur as early as 1999, and by the year 2000, Maine Yankee was having serious concerns about SWEC's continued solvency. *See, e.g.,* Jt. Stip. Ex. 220 (attached copy of Maine Yankee's Nov. 18, 1999, letter to SWEC). (SWEC then and Federal Insurance now have disputed the legitimacy of those concerns.) Maine Yankee declared a formal default by SWEC, based in part on insolvency, as of May 4, 2000. Jt. Stip. Ex. 222. For purposes of this ruling, I am asked to assume that Maine Yankee's total damages caused by SWEC's failure or default exceed the $38 million penal amount

of the performance bond.[2] The parties have stipulated that as of May 4, 2000, approximately $12 million worth of labor and materials from SWEC's subcontractors and suppliers had accrued and not yet been paid by SWEC. Jt. Stip. ¶ 17; Jt. Stip. Ex. 26. These amounts were not all overdue, Jt. Stip. Ex. 2 (Exhibit B); Jt. Stip. ¶ 31, however, and there is no claim that Federal Insurance defaulted on its payment bond in not having paid them as of that date.

For a number of reasons, Maine Yankee was anxious that this complex project go forward without delay. To mitigate damages and assuage its concern over SWEC's insolvency, it therefore negotiated an Interim Service Agreement ("ISA") with SWEC, by which SWEC would continue temporarily on the project, on essentially a reimbursable cost basis, but Maine Yankee would pay subcontractors and suppliers directly. *See* Jt. Stip. Ex. 227 (letter from Maine Yankee representative to Federal Insurance representative citing Maine Yankee's concerns during the post-default negotiation period); Jt. Stip. Ex. 2 at 2. Maine Yankee and SWEC signed the ISA on May 10, 2000.

Maine Yankee sought and obtained Federal Insurance's concurrence in this arrangement. Federal Insurance signed the ISA on May 15, 2000. In the ISA as finally executed by each of Maine Yankee, SWEC, and Federal Insurance, the parties agreed as of May 10, 2000, that Maine

1. On the performance bond, SWEC was obliged as principal to complete performance and Federal Insurance was obliged as surety to the same obligation; the named obligee was Maine Yankee. Jt. Stip. Ex. 3. On the payment bond, SWEC was obliged as principal to pay all the subcontractors and suppliers and Federal Insurance was obliged as surety to the same obligation; the named obligee was Maine Yankee, although the bond also stated that it was for the benefit of "any sub-

contractor, materialmen or laborer having a just claim." Jt. Stip. Ex. 4.

2. Jt. Stip. at 2. If the total amount Maine Yankee had to pay to complete the project did not exceed the amount of the performance bond, then the performance bond would make it whole without any reliance upon the payment bond.

Yankee henceforth would pay the subcontractors and suppliers directly and also pay already accrued amounts. Jt. Stip. Ex. 2 at 2–4. Performance bond rights were expressly preserved and other rights generally were preserved:

> all Parties wish to preserve and reserve their respective rights and obligations under the Decommissioning Agreement, the Performance Bond and applicable law with respect to all issues, including, without limitation, the Termination Notice....
>
> This Interim Service Agreement and the promises and covenants made herein do not supercede, replace, modify, amend or, in any way, affect the Parties' rights and obligations under the Decommissioning Agreement, the Termination Notice, the Performance Bond and the law. The Parties expressly reserve all of their rights under the Decommissioning Agreement, the Termination Notice, the Performance Bond and under applicable law.

*Id.* at 1, 5. But there was no reference to the payment bond.[3] From May 4 to May 10 there had been no discussions between Federal Insurance and Maine Yankee about any claim under the payment bond. Jt. Stip. ¶ 36. Thereafter Maine Yankee did pay the subcontractors and suppliers in the amount of approximately $12 million for pre-May 4 accruals, but without taking any assignment of the subcontractors' and suppliers' rights against Federal Insurance under the payment bond. Jt. Stip. Ex. 26; Jt. Stip. ¶ 32, 33. Eventually, Maine Yankee took an assignment of SWEC's rights under certain subcontracts and became contractually related to those subcontractors directly, but in those assignments there was an express preservation of payment bond rights.[4]

Ultimately, Maine Yankee decided to complete the decommissioning project itself, and pursued its formal claim against Federal Insurance for the full amount of the performance bond. Federal Insurance rejected the performance bond claim. Jt. Stip. Ex. 286. In the course of a two-page, single-spaced letter, Federal Insurance said on page 2:

> Your May 1, 2000 letter was the first notice that we had ever received that last year Maine Yankee had declared Stone & Webster in default. Maine Yankee's failure to notify Federal, the surety, when Maine Yankee declared a [default] last year results in Federal's not being afforded the opportunity to take steps at that time that might have resulted in the issues that concerned Maine Yankee being addressed. Nevertheless, it does appear that, after the prior declaration of default, Stone & Webster and Maine Yankee worked out

---

3. The record as stipulated does not reflect the reason for this omission. In any event, there is no suggestion that any party intentionally hid reference to possible payment bond rights.

4. Maine Yankee, SWEC, and Federal entered into four written agreements relevant to this case between May 10 and June 27. They entered into the ISA on May 10, although Federal did not sign the agreement until May 15. Jt. Stip. Ex. 2. On May 22, they entered into the First Amendment to the ISA. Jt. Stip. Ex. 2.1. On May 25, they entered into an assignment agreement concerning four of SWEC's subcontractors. Jt. Stip. Ex. 81. Finally, on May 31, they entered into a second assignment agreement, which concerned an additional group of SWEC's subcontractors. Jt. Stip. Ex. 82. Federal did not sign the First Amendment to the ISA or either of the assignment agreements until June 8. Hereafter in the text, I refer to all of these agreements collectively as the ISA, because none of them, individually, materially alters the analysis. (There was also a second amendment to the ISA that was signed by Maine Yankee and SWEC on June 27, but was not signed by Federal Insurance. Jt. Stip. Ex. 2.2.)

a modification to the contractual payment procedures. While that modification was reached without Federal's knowledge or participation, Maine Yankee thereafter accepted Stone & Webster's continued performance as a cure to the previously declared defaults, and there were no grounds for resurrecting the defaults in early May 2000.

*Id.* at 2. The parties agree that Maine Yankee did not notify Federal Insurance of any default in 1999. Supplemental Joint Stipulation of Facts ¶ 4. But the performance bond has no notice requirement. *See* Jt. Stip. Ex. 3. Maine Yankee asserts that the rejection letter implicitly states that there was such a requirement, thereby making an intentional misrepresentation under the Maine statute. Jt. Stip. ¶ 63.

### III. UNJUST ENRICHMENT-THE PAYMENT BOND ISSUE

#### A. Payment Bond Rights

■ The parties agree that Maine Yankee has no right to recover contractually under the payment bond. There seem to be two reasons for this. First, although Maine Yankee is a named obligee on the payment bond, the caselaw generally disfavors an owner/named obligee bringing suit on a payment bond. *See Trustees of Bricklayers and Allied Craftsmen Local No. 3 v. Reynolds Elec. & Eng'g Co.*, 747 F.Supp. 606, 612 (D.Nev.1990); *Ayers Enters., Ltd. v. Exterior Designing, Inc.*, 829 F.Supp. 1330, 1332–33 (N.D.Ga.1993); *Bd. of Educ. v. Hartford Accident & Indem. Co.*, 152 Ill.App.3d 745, 105 Ill.Dec. 715, 504 N.E.2d 1000, 1005–06 (1987). Instead, the usual plaintiffs on a payment bond are the subcontractors and suppliers themselves who customarily (as in this bond) are identified as beneficiaries of the bond.

Second, Maine Yankee concedes that Federal Insurance did not actually default on the bond.[5] Because of Maine Yankee's concerns for speed and lack of interruption on the project, it paid the subcontractors and suppliers before Federal Insurance was contractually obliged to, and before any demand was made. Federal Insurance never had an unconditional duty to pay under the payment bond.

#### B. Equitable Subrogation

■ Instead, Maine Yankee has sued Federal Insurance under what the Maine Law Court calls equitable subrogation. *Nappi v. Nappi Distribs.*, 691 A.2d 1198, 1199 (Me.1997); *United Carolina Bank v. Beesley*, 663 A.2d 574, 576 (1995); *North East Ins. Co. v. Concord General Mut. Ins. Co.*, 433 A.2d 715, 719 (Me.1981). The theory is that, by paying the subcontractors and suppliers, Maine Yankee steps into their shoes and obtains their rights to make Federal Insurance pay their claims, even without obtaining express assignments of their rights against Federal Insurance. Since the bond amounts never actually came due, at bottom Maine Yankee is arguing that Federal Insurance has been unjustly enriched—that, by virtue of Maine Yankee's payments to the subcontractors and suppliers, Federal Insurance has saved the $12 million it would ultimately have had to pay them under the payment bond, a risk for which Federal Insurance received a premium. *See* Restatement of Restitution § 1 cmt. b (1937) (benefits include saving another from expense or loss); John W. Wade, *Restitution for Benefits Conferred Without Request*, 19 Vand. L.Rev. 1183, 1186 (1966) ("One is enriched not only when he receives an asset but also when someone else performs for him a duty which would be a burden to

---

5. At least for the most part. Apparently as of May 4, 2000, there may have been about $1.5 million actually overdue. Federal Insurance's Opp'n Br. at 6 (Oct. 24, 2001).

him."). Maine law does recognize the availability of restitution for unjust enrichment. *See generally* Horton & McGehee, *Maine Civil Remedies* ch. 7 (1992) (hereafter Horton & McGehee). Under Maine law of equitable subrogation combined with unjust enrichment, "[o]ne who pays a debt that in equity and good conscience should have been paid by another succeeds to the rights of the payee against the other." *North East,* 433 A.2d at 719; accord *Nappi,* 691 A.2d at 1199.

### C. Unjust Enrichment

■ I proceed therefore to the question whether there was unjust enrichment.[6] Under Maine law:

> To establish a claim for unjust enrichment, three elements must be proven: "[One] a benefit conferred upon the defendant by the plaintiff; [two] an appreciation or knowledge by the defendant of the benefit; and [three] the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value."

*Aladdin Elec. Assocs. v. Town of Old Orchard Beach,* 645 A.2d 1142, 1144 (1994) (quoting *A.F.A.B., Inc. v. Town of Old Orchard Beach,* 610 A.2d 747, 749 (Me. 1992)).[7]

■ On the first two elements, Maine Yankee has saved Federal Insurance the burden of paying certain claims under the payment bond (calculation of the amount I will discuss later), and Federal Insurance has known from the outset that Maine Yankee was paying the subcontractors and suppliers.[8]

---

**6.** The three Law Court cases on equitable subrogation during the past twenty years— *Nappi, Beesley* and *North East*—do not expressly separate the unjust enrichment analysis from the equitable subrogation doctrine. In light of their dependence on unjust enrichment principles, however, I see no alternative but to assess Maine Yankee's claim under that doctrine. *But see* Michael Sean Quinn, *Subrogation, Restitution and Indemnity,* 74 Tex. L.Rev. 1361, 1395–96 (1996).

**7.** The Law Court has taken pains recently to distinguish *quantum meruit* claims (implied contract claims) from unjust enrichment claims. *Paffhausen v. Balano,* 708 A.2d 269, 271 & n. 3 (Me.1998); *Aladdin,* 645 A.2d at 1145. For a *quantum meruit* claim there are also three elements, but they are subtly and importantly different:

> A valid claim in *quantum meruit* requires: "that (1) services were rendered to the defendant by the plaintiff; (2) with the knowledge and consent of the defendant; and (3) under circumstances that make it reasonable for the plaintiff to expect payment."

*Paffhausen,* 708 A.2d at 271 (citation omitted).

**8.** There is no explanation in the Maine caselaw of the reason for or the significance of the second element. The corresponding requirement in a *quantum meruit* claim—that services be rendered "with the knowledge and consent of the defendant," *Paffhausen,* 708 A.2d at 271—makes sense, because the question there is whether a contract should be implied from the conduct of the parties. But what the defendant's "appreciation" or "knowledge" has to do with an unjust enrichment claim is puzzling (and indeed what the distinction is between appreciation and knowledge). In Maine, the requirement originates in *Estate of White,* 521 A.2d 1180 (Me. 1987). *Estate of White* took it from Williston on Contracts, 12 Williston on Contracts § 1479, at 276 (3d ed.1970), and proceeded to equate it to *quantum meruit* principles, quoting from and citing a line of *quantum meruit* cases. *Estate of White,* 521 A.2d at 1183. Williston announced the requirement in a section dealing with what happens when a contract fails and the remedy is rescission with restitution for unjust enrichment. Williston cited a single case from Wisconsin for the proposition, *Gebhardt Brothers, Inc. v. Brimmel,* 31 Wis.2d 581, 143 N.W.2d 479, 481 (1966). *Gebhardt* cited *Superior Plumbing Co. v. Tefs,* 27 Wis.2d 434, 134 N.W.2d 430, 432 (1965); *Superior Plumbing* cited *Nelson v. Preston,* 262 Wis. 547, 55 N.W.2d 918, 920

■ The third element—that Federal Insurance's retention of benefits would be unjust—has also been satisfied. Under the surety bond, Federal Insurance, not Maine Yankee, was the party obliged to pay if SWEC did not pay the subcontractors and suppliers. Maine Yankee paid, with the result that Federal Insurance did not have to pay.[9] Under Maine law, subrogation or recovery in unjust enrichment is not available to a "volunteer." *North East*, 433 A.2d at 719. But Federal Insurance concedes that Maine Yankee is not a "volunteer" within the meaning of Maine caselaw. Federal Insurance's Reply Mem. at 1 (Oct. 31, 2001). The concession is appropriate because the term in Maine is "narrowly and strictly interpreted to allow liberal application of the doctrine of subrogation." *North East*, 433 A.2d at 719; *accord Nappi*, 691 A.2d at 1200–01 (economic or reputational interests will suffice). Certainly Maine Yankee had sufficient independent economic self-interest in paying the subcontractors and suppliers to escape the opprobrium of being called a "volunteer." [10] Maine Yankee paid and Federal Insurance, the surety who had accepted the risk of guaranteeing the payments, thereby avoided the obligation.

■ But under Maine law, unjust enrichment is also not available if the parties have dealt with their relationship through contract.[11] In *Nadeau v. Pitman*, 731 A.2d 863 (Me.1999), the Law Court stated:

(1953); *Nelson* cited *Dunnebacke Co. v. Pittman*, 216 Wis. 305, 257 N.W. 30, 32 (1934). *Dunnebacke* listed only the first and third elements, not the second. But *Dunnebacke* denied recovery on the basis that the defendants' property was improved without their knowledge, they wanted the improvement (a breakwater) removed, and they never showed any intent to retain the improvement. *Dunnebacke*, 257 N.W. at 31. That seems to be why the second element was added. If that is the significance of the second element—to be sure that the defendants are undisputably benefited by the payment, rather than in their judgment harmed or inconvenienced by it—it seems to be duplicative of the third element, but in any event it is satisfied here. Indeed, a 1981 Maine equitable subrogation case made no mention of the requirement in reinstating an unjust enrichment claim against an insurance company whose possible coverage was not even known at the time the payment in question was made. *North East Ins. Co. v. Concord Gen. Mut. Ins. Co.*, 433 A.2d 715 (Me.1981).

9. There is no suggestion that Federal Insurance was prejudiced in any way by Maine Yankee's "early" payment (*i.e.*, shortly before due and without demand). There is also no suggestion that Maine Yankee intended to act gratuitously.

10. The unavailability of restitution to one who acts "officiously" or as a "volunteer" is to penalize those who "thrust benefits upon others," Restatement of Restitution § 2 cmt. a, hardly the situation here. Federal Insurance does argue that Maine Yankee was only fulfilling its own contractual commitments in making payments—commitments it undertook in the ISA. That argument shows that Maine Yankee was not a volunteer, but does not impair its claim for restitution given my conclusion later in text that the contracts here did not occupy the field. Some of the academic commentary does speak of the performance of a valid contract resulting in benefits for a third party stranger as creating only "incidental" benefits and asks skeptically whether restitution should assist the contracting party there, to "relieve [it] from the risk that remedies against [its] own contract partner might fail." John P. Dawson, *The Self-Serving Intermeddler*, 87 Harv. L.Rev. 1409, 1444 (1974); *see also* Restatement of Restitution § 106. The cases tend to involve instances where a defendant would otherwise have had a choice whether or not to make the expenditure. *See* Andrew Kull, *Restitution and the Noncontractual Transfer*, 11 J. Cont. L. 93, 108 (1997). Those concerns do not apply here. Federal Insurance was a party to the contracts in question, those contracts did not deal with this issue, and Federal Insurance ultimately would have had to pay regardless.

11. Maine cases are not clear on whether this is part of the third element, or an independent requirement. I put it here for logic and convenience.

The remedy of unjust enrichment describes recovery for the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay. The existence of a contractual relationship, precludes recovery on a theory of unjust enrichment.

*Id.* at 866–67 (citations omitted); *accord In re Wage Payment Litig.*, 759 A.2d 217, 224 (Me.2000); *June Roberts Agency, Inc. v. Venture Props., Inc.*, 676 A.2d 46, 49 n. 1 (Me.1996); *Lynch v. Ouellette*, 670 A.2d 948, 950 (Me.1996); *Top of the Track Assocs. v. Lewiston Raceways*, 654 A.2d 1293, 1296 (Me.1995); Horton & McGehee § 7.6. Read at its broadest, this oft-repeated pronouncement could doom Maine Yankee's claim. It is unfair to disconnect the language from the facts of the cases, however.

In each instance, the contract in question covered the same subject matter as the unjust enrichment claim. It is reasonable to understand the Law Court's pronouncement, therefore, as stating that a contract covering the same subject matter forecloses an unjust enrichment claim.[12] After all, parties may have any number of other contractual relationships having nothing to do with the issue in question and the Law Court cannot have intended to foreclose all unjust enrichment claims between such parties.[13]

There were two relevant contractual relationships here—the payment bond and the ISA—between Maine Yankee and Federal Insurance.

Since neither party claims that the payment bond terms governed their relationship on this issue, I set it aside as they do.[14]

**12.** Thus, in an early case involving a sewer construction contract where the contractor made a claim for payments above the contract price because of alleged misrepresentations about conditions, the Law Court held that he might repudiate the contract and sue in deceit, but if he sued in assumpsit he affirmed the contract and "[w]here the parties have made a contract for themselves, *covering the whole subject-matter*, no provision is implied by law." *Prest v. Inhabitants of Farmington*, 117 Me. 348, 104 A. 521, 523–24 (1918) (emphasis added). The academic commentary is comparable. *See* Kull, 11 J. Cont. L. at 93–94, 98 ("Restitution is thus, from the outset, the law of a residual and anomalous case: the one in which a transfer . . ., not intended as a gift, has taken place without benefit of contract. . . ."; "a claim in restitution must in every case *yield to an obligation that is fixed by agreement*") (emphasis added); Keith Mason, *Commentary on 'Restitution and the Noncontractual Transfer'*, 11 J. Cont. L. 111, 111 (1997) ("[A] restitutionary claim cannot exist in an area *occupied by a subsisting contract.* Benefit conferred pursuant to a valid contract is, by presumption of law, not unjust.") (emphasis added); Restatement of Restitution § 107(1) & cmt. a; Douglas Laycock, *The Scope and Significance of Restitution*, 67 Tex. L.Rev. 1277, 1285 (1989) ("restitution should

not undermine policies of tort or contract law that are served by denying recovery").

**13.** For example, I may have a contract with a snowplow operator to clear my driveway in each snowstorm. If he subsequently discovers my car abandoned along the side of a public road and tows it to a garage, thereby avoiding damage to it, I may be liable to him in unjust enrichment for his fees for towing. *See* Restatement of Restitution § 117 & illus. 2. Our contract for snowplowing would not displace the unjust enrichment claim for towing services.

**14.** Federal Insurance does argue that Maine Yankee's effort to recover in unjust enrichment for its payment of pre-May 4, 2000, labor and supplies separately from the performance bond is a thinly disguised attempt to extend performance bond coverage in a context where Maine Yankee mistakenly contracted for too little coverage (only 15% of the project). As I observed in footnote 2, Maine Yankee can recover in unjust enrichment on these claims only if its total damages exceed the performance bond ceiling. As the parties have requested, I am assuming that is so for purposes of this ruling, and further evidence will have to be taken on the actual amounts.

■ The effect of the ISA, on the other hand, deserves scrutiny. SWEC, Maine Yankee, and Federal Insurance were all parties. These were large dollar transactions. Sophisticated corporations with excellent lawyers were involved. Should I conclude, therefore, that the parties intended to occupy the universe of their financial relationships by the terms and provisions of the ISA documents? If so, Maine Yankee should be limited to only the rights it preserved under the ISA. Recovery under a theory of unjust enrichment independent of or parallel to the ISA would then be an impermissible end run around a voluntary structuring of relationships and their consequences.

To answer the question, I look to the terms of the ISA. According to ¶ 12:

> The Parties agree and acknowledge that this Interim Service Agreement and the promises and covenants made herein are intended to mitigate the damages and adverse consequences of an abrupt or inefficient demobilization at the Maine Yankee site as a result of the Termination Notice and other contested issues between and among the Parties by allowing certain work and demobilization to proceed on the specific terms and conditions herein and for the limited term described herein.

In other words, this was a document focused on keeping SWEC and the subcontractors on the job in a manner satisfactory to Maine Yankee, given Maine Yankee's concerns about SWEC's insolvency. The only references to Federal Insurance are the following:

(1) It is a named party to the ISA in the opening paragraph;

(2) It is described as surety on the performance bond in the second "Whereas" clause;

(3) It is described as receiving notice of SWEC's default and Maine Yankee's termination of the decommissioning agreement in the third "Whereas" clause;

(4) Numbered paragraph 9 states that if Maine Yankee takes assignment of four specific subcontracts from SWEC, it shall be without prejudice to seeking costs or expenses "from SWEC and/or Federal as a result of the termination of the Decommissioning Agreement"; and

(5) Its signature on page 6.

In this six-page document of seventeen numbered paragraphs, Federal Insurance took on no obligations. Federal Insurance's written concurrence guaranteed only that it did not object to the arrangement. Indeed, the final paragraph specified that the agreement would be "valid and effective between Maine Yankee and SWEC if executed and delivered on Wednesday, May 10, 2000." (And, in fact, Federal Insurance did not sign the ISA until May 15.) I conclude that the ISA created a contractual relationship between Maine Yankee and Federal Insurance, but not over payment bond issues. It simply does not speak to the benefit that would be conferred upon Federal Insurance by Maine Yankee's payment of the subcontractors' and suppliers' already accrued accounts. The ISA did not expressly preserve payment bond rights, but general protective language (preserving rights with respect to "all issues" and under "applicable law") made clear that no other relationships were being structured or modified.[15] This is not the sort of contrac-

---

**15.** Federal Insurance argues that I should infer from express preservation of performance bond rights that any payment bond rights had been surrendered (*"expressio unius est exclusio alterius"*). But the ISA says broadly that rights were being preserved

tual relationship that, under Maine law and general principles of unjust enrichment, forecloses recovery.[16]

To summarize, Federal Insurance contracted under the surety bond to pay the subcontractors and suppliers if SWEC failed to do so. SWEC did fail to do so, and Maine Yankee stepped in—not as a volunteer—and paid, the result being that Federal Insurance did not have to. There is no suggestion that Federal Insurance would not have been obliged to ·pay if Maine Yankee had not paid. Federal Insurance thus has benefited from payments Maine Yankee made under circumstances that would make it unjust not to provide restitution. I conclude that Maine Yankee can proceed on its equitable subrogation claim against Federal Insurance for unjust enrichment based upon payments made to subcontractors and suppliers for work performed and materials supplied before May 4, 2000.

### D. Amount

The amount of recovery remains to be determined at trial. The parties have stipulated that approximately $12 million that Maine Yankee paid to subcontractors and suppliers was for work performed and materials supplied prior to May 4, 2000. If the payments were to proper claimants

under the payment bond (a factual issue still to be determined), these are amounts that Federal Insurance was obliged to pay under the payment bond if SWEC failed to pay them. Federal Insurance argues, however, that if it had paid these amounts, it would have become subrogated to SWEC's rights against Maine Yankee (Maine Yankee concedes this point) and that payments due from Maine Yankee to SWEC—for example, in excess of $6 million on the termination date—would have offset all the amounts; hence, no unjust enrichment. But Maine Yankee argues that it owed SWEC nothing because it had offsetting claims against SWEC for various defaults under the decommissioning contract. Maine Yankee argues that Federal Insurance cannot be in any better position than SWEC and therefore that there is nothing left after the set off.

On the stipulated record, I cannot resolve factually what amounts were due from Maine Yankee to SWEC (Maine Yankee says some SWEC invoices included amounts already built into the base price and already paid) or could be set off. The law, however, is clear. If Maine Yankee had claims against SWEC on a related matter—and claims growing out of the Decommissioning Contract are certainly on a

---

"with respect to all issues" and "under applicable law." Moreover, it would have been just as easy for Federal Insurance to insert language that payment bond rights were being waived as for Maine Yankee to insert language that payment bond rights were being preserved. So far as the record discloses, payment bond rights simply did not occur to anyone. This is probably not surprising, under the circumstances of time pressures, a complex project, and the obvious availability of a performance bond as a first line of attack. But as I noted in footnote 3, the record does not disclose the actual reason.

16. Thus, if I were asking the question whether this was an "omitted term" in the contract, such that the court must supply it, my answer

would be that this term is not "essential to a determination of [the parties'] rights and duties" under the ISA. Restatement (Second) of Contracts § 204 (1979). Looking at the issue from still a different perspective, it is often said that unjust enrichment, along with tort and contract, is a distinct source of available civil liability. See, e.g., Laycock, The Scope and Significance of Restitution, .67 Tex. L. Rev 1277 (1989). That appears to be the law in Maine. If Maine Yankee's claims for the $12 million sounded in tort, Federal Insurance would be hard-pressed to argue that the ISA contract displaced—i.e., waived—them, given its language. I reach the same conclusion for the unjust enrichment claims. The contract did not foreclose them.

related matter—then Maine Yankee was entitled to set them off against amounts otherwise due to SWEC, and Federal Insurance stands in no better position. That is the position taken by the Restatement (Third) of Suretyship § 31 (1995), and it is consistent with what the United States Supreme Court has said in Miller Act cases.[17] I conclude that the Maine Law Court would follow those authorities.

Federal Insurance also argues that some amounts might result in double recovery—that if Federal Insurance pays amounts for supplies to Maine Yankee because of the payment bond, Federal Insurance thereby acquires title to all materials that had not yet been incorporated into the project, and Maine Yankee must therefore "purchase" these materials from Federal Insurance for use on the project, a claim that thereby

comes under the performance bond and its ceiling. The stipulated record does not permit resolution of this issue. It, too, must await trial.[18]

## IV. UNFAIR CLAIMS SETTLEMENT PRACTICES—THE PERFORMANCE BOND CLAIM

 On its unfair claims settlement practices claim, Maine Yankee declares itself dissatisfied with Federal Insurance's negative response to its performance bond claim in two ways. First, it says that Federal Insurance knowingly misrepresented a provision of the surety coverage when, in denying Maine Yankee's claim, it complained that Maine Yankee had not notified it of an earlier declaration of default against SWEC in 1999. Second, by

---

**17.** In *United States v. Munsey Trust Co.*, 332 U.S. 234, 244, 108 Ct.Cl. 765, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947), the Court held that a payment bond surety's subrogation right to funds earned by the contractor but retained by the owner was subject to the owner's set off claims related to the contract. Fifteen years later, in *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 141–42, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), the Court held that a payment bond surety's subrogation right to a similar retained fund had priority over the claims of the contractor's general creditors (as represented by the contractor's bankruptcy trustee). The *Pearlman* Court rejected the argument that the *Munsey* Court had "abandon[ed] the established legal and equitable principles ... under which sureties can indemnify themselves against losses." *Id.* at 140, 83 S.Ct. 232. Instead, the Court emphasized that *Munsey* stood for "the well-established common-law right of debtors to offset claims of their own against their creditors." *Id.* Thus, taken together, *Munsey* and *Pearlman* establish a hierarchy of rights to retained contract funds (with the owner's claims having the highest priority, followed by the surety's claims, and, finally, the claims of the contractor's other creditors) that applies to both performance and payment bonds. Other courts have further clarified this rule, limiting an owner's right to set off

claims related to the subject matter of the contract. *See Trinity Universal Ins. Co. v. United States*, 382 F.2d 317, 321 (5th Cir. 1967) (holding that United States, as owner, was not entitled to set off contractor's tax liability against retained contract funds claimed by performance bond surety) (discussing *Munsey* and *Pearlman*); *see also Security Ins. Co. v. United States*, 192 Ct.Cl. 754, 428 F.2d 838, 842–43 (1970) (same); Restatement (Third) of Suretyship § 31 ("the obligee may not set off against the secondary obligor's right to return performance any claim against the principal obligor that is unrelated to the underlying obligation"). Although the *Trinity* and *Security Insurance* courts distinguished payment and performance bonds, the substance of their distinction rested on the difference between related and unrelated set off claims. Both courts simply made the (reasonable) assumption that an owner would not have any claims related to the contract if the performance bond surety had stepped in and completed the project.

**18.** Federal Insurance also argues that by paying the payment bond claims, it becomes subrogated to the subcontractors' and suppliers' lien rights against Maine Yankee. I reject that argument. The whole purpose of a payment bond is to avoid the lien rights.

denying coverage on grounds that its termination of SWEC was improper, Maine Yankee argues that Federal Insurance failed to settle its claims after liability was reasonably clear.[19]

The central question on this issue is whether surety bond coverage—in particular, a contractor *performance* bond—is subject to Maine's unfair claims settlement practices statute, 24–A M.R.S.A. § 2436–A (2000), a provision that appears in Maine's general Insurance Code. There has been a spirited debate at common law over the similarities and differences between traditional insurance and suretyship. *See Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 140 n. 19, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962) ("[T]he usual view, grounded in commercial practice, [is] that suretyship is not insurance."); *Cates Constr., Inc. v. Talbot Partners*, 21 Cal.4th 28, 86 Cal. Rptr.2d 855, 980 P.2d 407, 418–27 (1999) (listing reasons why suretyship relations should be treated differently than insurance relations); *Transamerica Premier Ins. Co. v. Brighton Sch. Dist. 27J*, 940 P.2d 348, 351–53 (Colo.1997) (reverse position in Colorado); 1 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 1:18 (3d ed.2001) (comparing the nature of the insurer's risk and liability in surety and insurance agreements) (hereafter *"Couch on Insurance"*); 11 *Couch on Insurance* § 163:1 (same); 11 *Couch on Insurance* § 163:17 (noting that performance bonds "have been considered to be essentially contracts of insurance, although they may resemble in form contracts of suretyship"); John J. Aromando, *The Surety's Liability for "Bad Faith": Claims for Extra–Con-*

*tractual Damages by an Obligee Under the Payment Bond*, 47 Me. L.Rev. 389, 391–92, 399–407 (1995) (citing arguments made by various state courts for and against the availability of a bad faith tort claim to payment bond claimants based on the differences between suretyship and insurance). In Maine, however, the question must be asked and answered as a matter of statutory interpretation. In 1969, Maine enacted a comprehensive insurance code, *see* Act Providing the Maine Insurance Code, c. 132, 1969 Me. Laws 350 (1969) (codified as amended at 24–A M.R.S.A. (2000)), and it included suretyship in its coverage. *See, e.g., id.* § 3 (defining contracts to act as surety as "insurance"); *id.* § 4 (defining sureties as "insurers"); *id.* § 410 (listing the minimum capital requirement for sureties); *id.* § 706 (defining surety insurance to include "insurance guaranteeing the performance of contracts"); *id.* § 2302 (including sureties among insurance providers whose rates are regulated by the statute); *id.* §§ 3101–05 (various provisions specifically regulating surety contracts). On our precise issue, the Maine Insurance Code provides that "[a]ll contracts of surety insurance delivered or issued for delivery in this State and covering subjects resident, located, or to be performed in this State are also subject to the applicable provisions of chapter 27," the chapter that includes the unfair claims settlement practices provision. 24–A M.R.S.A. § 3101 (2000). Therefore, if section 2436–A is "applicable" to the surety relationship, then it governs.[20]

---

19. Originally, Maine Yankee presented three claims under 24–A M.R.S.A. § 2436–A (2000), *see* Maine Yankee's Answer at 10 (Oct. 30, 2000); Maine Yankee's Pre–Trial Mem. at 3 (Aug. 8, 2001), but now appears to have collapsed them into two. *See, e.g.,* Maine Yankee's Trial Mem. at 7 (Sept. 18, 2001).

20. There is no basis in the statutory language or Maine caselaw for Federal Insurance's argument, *see, e.g.,* Federal Insurance's Trial Br. at 15 (Sept. 18, 2001), that the Maine statute protects only "consumers." The Law Court's passing reference to section 2436–A as a "consumer protection statute" in *Saucier*

There is no explicit exclusion of suretyship in section 2436–A (only workers compensation is explicitly excluded). *See* 24–A M.R.S.A. § 2436–A(4) (2000). In that respect, section 2436–A is unlike section 2164–D, a provision granting rule-making power to the Superintendent of the Bureau of Insurance to regulate certain unfair claims practices, which does explicitly exclude suretyship coverage. *See* 24–A M.R.S.A. § 2364–D(9) (2000). Instead, section 2436–A provides civil remedies to any person injured by certain actions "taken by that person's own insurer." 24–A M.R.S.A. § 2436–A(1). The relevant question on a performance bond covering a construction contract, then, is whether the surety company is the owner's "own insurer"—in this case whether Federal Insurance is Maine Yankee's "own insurer."

Typically, the general contractor, not the owner, purchases the performance surety bond on a construction project, just as SWEC here—not Maine Yankee—purchased the protection. In the first instance, therefore, it is logical to consider the surety insurance company the general contractor's "own insurer." Furthermore, in assessing the risk of nonperformance, a surety company obviously considers primarily the general contractor and its assets, experience, and abilities—here, SWEC, its assets and performance—not the owner, here Maine Yankee. It is true that a general contractor purchases a performance surety bond only because an owner requires it, and necessarily calculates the cost of the bond into its contract price either directly or as part of overhead, but that does not alter whose insurer the bonding company is. It is also true that a performance bond names the owner as the obligee of the performance obligation owed by both the general contractor and the surety insurance company. As a result, the owner is the beneficiary of the surety's obligation in the event the contractor defaults, but that too hardly makes the surety the owner's "own insurer." [21]

Maine Yankee tries to distinguish performance bonds from payment bonds, because it apparently thinks its arguments in the case of payment bonds are weaker.[22] *See* Maine Yankee's Supp. Br. at 15 n. 2 (Oct. 24, 2001); Aromando, 47 Me. L.Rev. at 410–13 (arguing against the availability

---

*v. Allstate Insurance Co.,* 742 A.2d 482, 492 (Me.1999), does not operate to limit the statute's coverage.

**21.** *See Depositors Trust Co. v. Farm Family Life Ins. Co.,* 445 A.2d 1014, 1018 (Me.1982) (holding that the legislature's use of "insurer" and "insured" in section 2436 was an indication that life insurance was not covered under the statute because life insurance claims are made by third party beneficiaries). *But see Loyal Order of Moose, Lodge 1392 v. International Fidelity Ins. Co.,* 797 P.2d 622, 628 (Alaska 1990). ("In our view the relationship of a surety to its obligee—an intended creditor third-party beneficiary—is more analogous to that of an insurer to its insured than to the relationship between an insurer and an incidental third-party beneficiary."); *Szarkowski v. Reliance Ins. Co.,* 404 N.W.2d 502, 505 (N.D.1987) ("As an intended claimant, Szarkowski stands in a substantially identical relationship with Reliance as did the insured claimants with the insurers in [other cited cases].")

Even cases that treat bonding issues as closely akin to insurance issues (for purposes of deciding whether to recognize a tort cause of action for bad faith) recognize the awkwardness that results, since the commercial surety must often handle simultaneous claims from both the principal, its customer, and the obligee owner. *See, e.g., Transamerica Premier Ins. Co.,* 940 P.2d at 353 n. 4.

**22.** Maine Yankee reasons that on payment bonds the direct beneficiaries are the subcontractors and suppliers, not the owner. Presumably, then, the surety insurance company is the subcontractors' and suppliers' "own insurer" for a payment bond, rather than the owner's "own insurer," again hardly a felicitous use of the English language.

of section 2436–A protection to payment bond obligees). But all the other factors are the same—who purchases the bond, at whose behest, and whose risk is being assessed. It would distort the plain statutory language to conclude that an owner is not covered as a payment bond obligee, but the same owner is covered as a performance bond obligee, when a general contractor buys one of each from its surety insurance company. Moreover, a performance and a payment bond are sometimes combined in the same instrument. What are we then to do with the issue of statutory coverage—conclude that the surety is the obligee's "own insurer" for part of the risk and not for the other part of the risk?

The natural reading of section 2436–A is that a surety insurance company is not the owner's "own insurer" for either a payment or a performance bond that a general contractor has purchased under the requirements of a contract for a construction project. Certainly owners have their "own insurer" for any number of other risks, but for the performance of the contract, they seek to have the general contractor's own insurer guarantee it.[23] Moreover, the Maine Law Court has declared provisions like section 2436–A to be penal, requiring that their scope of coverage be construed narrowly. *See Burne v. John Hancock Mut. Life Ins. Co.*, 403 A.2d 775, 777 (Me.

1979) (interpreting the plain language of section 2436). Applying this canon, I conclude that section 2436–A should not be read to apply to an owner's claim under a surety performance bond purchased by the general contractor.

 Finally, even if I were to read the statute more broadly to encompass the claims of an owner/obligee under a performance bond, I conclude that there was no knowing misrepresentation on the stipulated record. Maine Yankee has conceded that it failed to provide notice of default in 1999. *See* Jt. Stip. Ex. 286 at 2. It argues, however, that Federal Insurance's letter rejecting its performance bond claim is to be read as an implicit and intentional misstatement that the surety bond required notice in 1999 as a condition of recovery in 2000 (there is no such requirement in the performance bond). *See, e.g.,* Maine Yankee's Supp. Br. at 18–20 (Oct. 24, 2001). The letter as quoted at the outset of this opinion does not say that, and no reasonable factfinder could find otherwise. To be sure, this is a typical lawyer's letter, including every assertion a lawyer can think of to make his own client look good and his opponent bad, but nowhere does it say or even imply that the performance bond required the earlier notice. Instead, reading the paragraph as a whole, I observe that it simply gives the background of how Maine

---

**23.** This is consistent with general usage. When referring to the insurance company that provides the performance bond or liability coverage required by an owner (or general contractor) as part of a construction contract, courts regularly contrast that insurance company with the owner/obligee's "own insurer." *See, e.g., Andrew L. Youngquist, Inc. v. Cincinnati Ins. Co.*, 625 N.W.2d 178, 182 (Minn.Ct. App.2001) (obligee seeks reimbursement from principal's liability insurer for damages and fees covered by its "own insurer"); *John Burns Constr. Co. v. Indiana Ins. Co.*, 189 Ill.2d 570, 244 Ill.Dec. 912, 727 N.E.2d 211, 214–15 (2000) ("[Obligee] was covered by two insurance policies: its own, issued by Royal, and [Principal's], issued by Indiana. [Obligee] tendered the defense of the Gault litigation to Indiana and expressly directed its own insurer, Royal, not to become involved."); *Maryland Cas. Co. v. Nationwide Ins. Co.*, 65 Cal.App.4th 21, 76 Cal.Rptr.2d 113, 115 (1998) ("[Obligee] was sued for construction defects at the project. [Obligee] tendered defense of the underlying action to its own insurers ... as well as to [Principal's insurer] under the terms of the [contract].").

Yankee and SWEC reached an accommodation of their earlier struggle.[24] It does not claim lack of notice as a contractual defense to payment.

To summarize, I conclude that the Maine statute does not apply to the relationship between Federal Insurance and Maine Yankee under the performance surety bond and that even if it did, there was no intentional misrepresentation in rejecting the performance bond claim. Neither party has asked me to rule on Maine Yankee's section 2436–A(1)(E) claim. *See* Jt. Stip. at 1. Given my ruling that section 2436–A does not cover any of Maine Yankee's claims under the performance bond, however, Count III may not proceed.

\* \* \* \* \* \*

According to the Maine caselaw that recognizes Maine Yankee's theory of recovery on Count II, the unjust enrichment claim arising out of the payment bond, is an equitable remedy. *See, e.g., Nappi,* 691 A.2d at 1199 (citing *United Carolina Bank v. Beesley,* 663 A.2d 574, 576 (Me.1995); *Aladdin Elec. Assocs. v. Town of Old Orchard Beach,* 645 A.2d 1142, 1144 (Me. 1994)). I direct the parties to show cause, therefore, by November 30, 2001, why the remainder of Count II should not be tried to the bench rather than the jury.

The case manager shall schedule another trial management conference soon thereafter to discuss how the remainder of this matter shall proceed. As the parties know, jury impanelment is scheduled for January 7, 2002.

So ORDERED.

---

**24.** Maine Yankee points to the later repetition of the asserted notice failure in Federal's complaint and in a proposed jury instruction. *See* Compl. for Declaratory J. ¶ 14 (June 30, 2000); Federal Insurance's Proposed Jury Instruction No. 19 (Sept. 18, 2001). Maine Yankee conceded at oral argument that the court documents were not themselves actionable under the statute, but argued that they were evidence of Federal's earlier intent. Assuming that the later statements in court proceedings are admissible on Federal's earlier intent, the relationship is extremely attenuated. Moreover, the actual arguments Federal has made in the legal proceedings are mitigation arguments, not arguments that the surety bond required the notice as a policy provision. *See* Federal Insurance's Reply to Countercls. ¶ 29 (Nov 29, 2000).