Gary L. **FARRIS** and Pamela K. Farris, Plaintiffs,

v.

**ITT CANNON, A DIVISION OF ITT CORPORATION, A Delaware corporation, Defendant.**

Civ. A. No. 92–B–1448.

United States District Court, D. Colorado.

Oct. 12, 1993.

Tim Correll, Waltz, D'Antuono, Correll & Anderson, Denver, CO, for plaintiffs.

E. Lee Dale, Andrew W. Volin, Sherman & Howard, Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Defendant ITT CANNON (ITT) moves for summary judgment contending there are no genuine disputes of material fact and it is entitled to judgment as a matter of law. The issues are adequately briefed and oral argument will not materially aid their resolution. For all the reasons below, the motion is granted in part and denied in part.

### I. BACKGROUND

This diversity action arises out of an employment relationship between ITT and plaintiff Gary L. Farris (Farris). Farris alleges that ITT wrongfully withheld commissions and broke promises to promote him. Farris asserts claims for violation of Colorado's statutory wage law and common law claims for breach of contract, promissory estoppel, and breach of the covenant of good faith and fair dealing. ITT seeks summary judgment on the statutory wage claim on the grounds that it is untimely. ITT also seeks summary judgment on Farris' common law claims. ITT contends that under choice of law principles, California law applies to these claims and, therefore, Farris' termination, which resulted from a work force reduction, precludes ITT's liability and, in any event, emotional distress damages are not recoverable.

Plaintiff Pamela K. Farris (Mrs. Farris) asserts claims for promissory estoppel and breach of the covenant of good faith and fair dealing based on promises that ITT made to her. ITT seeks summary judgment on the grounds that these claims are not recognized by any state and the facts are insufficient to support her claims.

## II. LEGAL ANALYSIS

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits if any, which it believes demonstrate the absence of genuine issues for trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir.1992). The nonmoving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Summary judgment is appropriate when the court concludes that no reasonable juror could find for the non-moving party based on the evidence present in the motion and response. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–52, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202 (1986); *Mares*, 971 F.2d at 494.

The undisputed facts and reasonable inferences are as follows. ITT employed Farris as a sales representative from July, 1980 until February, 1992. Farris was entitled to commissions in addition to his salary if he exceeded his budgeted quota. In March, 1988, Farris began negotiating with AMP, a ITT competitor. Farris had decided to quit ITT because he felt there was a lack of promotional opportunities and quotas were "arbitrarily" established.

On June 1, 1988, Farris announced his resignation. Later that day, Dave Myers (Myers), ITT's personnel director, called Farris. Myers expressed concern about Farris' resignation. Farris agreed that Myers could fly to Denver from California to meet with him. Subsequently, Myers met with Farris in Denver and told him that he was too valuable to lose, and asked if Farris would fly to California to meet with Ron Sullivan (Sullivan), marketing and sales director.

On June 6, 1988, in his first meeting with Sullivan in California, Farris expressed his concerns about ITT. Sullivan told Farris that he understood Farris was a valuable asset, and that he would make sure Farris would get the promotional opportunities that he wanted. In a second meeting that day, Sullivan, Farris and Myers discussed potential advancement opportunities and, in particular, relocating Farris to Seattle to work on Boeing's account. The Seattle transfer, although a lateral move, offered high visibility and Farris knew there had been regional managers in Seattle, but never in Denver. Farris was interested in this proposal, but wanted a clear understanding "that within a two or three year period—maybe a little longer" he would be promoted to regional sales manager covering the entire northwest territory. Farris understood that this management position would be Seattle based.

On June 7, 1988, more meetings were held. Sullivan prepared a memo about Farris' promotional and commission concerns. Sullivan and Myers suggested that Farris draft his own memo. An hour later, they met again and Farris gave them his memo. By the meeting's end, the parties agreed that in exchange for ITT's assurances about the opportunity for the northwest manager's position, Farris would forgo his resignation and make the lateral move to Seattle.

Farris returned to Denver, and on June 8, after discussing the California meetings with Mrs. Farris, Farris called Myers. Farris stated that he would stay with ITT and move to Seattle based on its promises. Almost immediately thereafter, the Farris put their Colorado house on the market. Mrs. Farris and their children remained in Colorado awaiting their house's sale. Farris moved to Seattle and purchased a new house and a lot for a custom home.

In November, 1989, Torson told Farris that he was recommending Farris for the northwest manager's position. However, in February, 1990, Dennis Kirstein (Kirstein) received the position, which was based out of California, not Seattle. Farris asked Torson why he did not get the job. He told Farris that ITT was going to put together a position for him in California that was of "equal or higher value" than the regional manager position. Torson's comment about an upcoming promotional opportunity in California was reiterated by Sullivan and Myers in subsequent conversations. Sullivan also explained that Kirstein was selected because the position had to be California based, and that there might still be a future regional manager's position in Seattle.

By March, 1991, Farris was back in Colorado working in essentially his old job. Sullivan had left ITT and Bryan Bachman (Bachman) was now in charge of sales. In April, 1991, Farris told Bachman that Sullivan had made him promotional commitments. Bachman said he would look into it. Shortly thereafter, Bachman left the company. In August, 1991, Farris discussed promotional opportunities with Garry Fabrizio (Fabrizio), the new sales director. Fabrizio told Farris that he would look into it. In February, 1992, Farris was told that he was being laid off because of a work force reduction.

There are two commission disputes at issue here, one involving Martin Marietta (M & M) and the other, DCX. The M & M order was originally booked, according to ITT, in December, 1987. As a result, Farris' 1988 quota was increased. Farris learned about the quota increase in February, 1989 when he received his 1988 commission's paycheck. Farris contends that this order should not have been "booked" in 1987 nor his 1988 quota raised. Farris asserts that this increase in his quota reduced his 1988 commissions by $15,900.

The second dispute involves the DCX contract, which Farris booked in 1988. ITT contracted to supply parts to DCX so that DCX could perform a government contract. The government canceled this contract in July or August, 1988. In February, 1989, ITT decided to hold Farris' 1988 commission payments on any unpaid portion of the DCX contract until DCX paid ITT. Farris first learned about this decision when he received his 1988 commission's paycheck. Farris asserts that this decision reduced his 1988 commissions by $17,865.00.

On April 3, 1989, Farris sent a memo to Sullivan addressing his 1988 commission concerns. In June, 1989, when Farris received his 1988 performance review, Farris, in his employee comments, again expressed his disagreement concerning his commissions. Farris' comments were circulated to Sullivan, Myers and Dick Torson (Torson), the three sales incentive committee (the committee) members. This committee was established by the sales incentive plan to resolve plan disputes. Neither Sullivan, nor the committee responded to Farris' concerns. On November 14, 1989, Torson sent Farris a memo in which he stated that he continued to disagree with him about the DCX bonus. This memo did not address the M & M commission nor did it represent the committee's decision on Farris' commissions dispute.

MRS. FARRIS' CLAIMS

Mrs. Farris had many conversations with ITT management personnel about her husband's future with the company. After Farris decided to stay with ITT in June, 1988, Marv Adams (Adams), Farris' new manager, told Mrs. Farris that Farris would be made a manager eventually and that was the reason he was moving to Seattle. Torson also told Mrs. Farris that ITT was happy that Farris had decided to stay and that the package ITT had drawn up was for their long run benefit for a future in the northwest. Ms. Lawrence, marketing administration manager, after hearing the difficulty Mrs. Farris was having as a result of Farris' absence, told her that the rewards would be worth it.

Myers told Mrs. Farris that he was glad that Farris had remained with ITT, that they made the right decision, and it would be worthwhile for them. He also said that "ITT would be good" for them, that "ITT had a lot of big plans" for Farris and "that was the reason [he] was going back to Seattle." In another conversation, Myers expressed sympathy about the Farris' living apart. Finally, he told her that Farris would be promoted

within a couple of years. Mrs. Farris had a similar conversation with Sullivan.

In the spring of 1990, when Kirstein was Farris's supervisor, he told Mrs. Farris that there would be great promotion opportunities for Farris in California and that it was just a matter of time. At the end of 1991, Mrs. Farris called Adams after she dreamed about a layoff. Adams laughed and said "no way."

### A) COLORADO STATUTORY WAGE CLAIM

Farris' fourth claim for relief alleges that ITT failed to pay his 1988 commissions in violation of the Colorado Wage Act (wage act), § 8–4–101, C.R.S. *et seq.* ITT contends that summary judgment is appropriate because this claim accrued in February, 1989 and, thus, the applicable two-year statute of limitations bars it. Farris counters that his wage act claim accrued in February, 1992 when he was terminated from ITT and, therefore, his claim is timely. I agree with Farris.

The wage act requires that employers who terminate an employee must immediately pay all wages or compensation earned and unpaid at the time of such discharge. § 8–4–104, 3B C.R.S. (1993 Cum.Supp.) All actions brought under the Act must be brought within two years after the cause of action accrues ... § 8–4–126, 3B C.R.S. (1986).

Where a statute's meaning is clear and unambiguous, the court must enforce it as written and its terms may not be varied or broadened by judicial construction. *Civil Service Com'n for Fire and Police Dept. of City of Aurora v. Leydon,* 491 P.2d 1391 (Colo.App.1971). Section 8–4–104 clearly and unambiguously provides that it only applies to employees whose wages are withheld after their employment terminates. Since this statute must be applied as written, § 8–4–104 fails to offer any relief to employees whose wages are withheld while they are still employed. *Id.* Consequently, Farris had no alternative but to wait until he left ITT in February, 1992 before bringing his § 8–4–104 wage claim. Accordingly, ITT's argument that Farris should have brought his wage claim in February 1989 is unwarranted

because the employer-employee relationship did not terminate until 1992.

In arguing that Farris' wage claim accrued in February, 1989, ITT relies on *Hofer v. Polly Little Realtors, Inc.,* 37 Colo.App. 86, 543 P.2d 114 (Colo.App.1975) and *Olsen v. Bondurant & Co.,* 759 P.2d 861 (Colo.App. 1988). ITT's reliance is misplaced. These cases fail to support ITT's proposition that a claim brought under the wage act accrues *before an employee is terminated.* Unlike here, the *Hofer* and *Olsen* courts addressed whether a wage act claim could accrue after termination rather than at termination when the compensation was not fully earned at termination. In *Hofer,* the court upheld a § 8–4–104 wage claim where real estate salesmen were terminated before the broker collected the commission at closing. The broker argued that no wages were earned or due at termination so he owed the salesmen nothing. The court stated that at the time the employment relationship is severed, an employer need not pay immediately compensation not yet fully earned but that such wages become immediately due when fully earned. Consequently, the court held that the broker owed the salesmen the commissions after the closing took place. *Olsen* also concerned unpaid real estate commissions. Again, the court upheld the salesmen's wage claim and found that it did not accrue until the last unit was sold and their commissions became due and payable.

ITT further contends that public policy supports its position because it prevents a recently terminated employee from bringing a claim for commissions that had been earned years before his termination. However, public policy favors the contrary conclusion.

ITT had established a sales incentive committee designed specifically to resolve commission disputes. After Farris' commission dispute began in February 1989, he attempted to amicably resolve this controversy by working through ITT's established channels rather than resigning and bringing a wage act claim immediately. On April 3, 1989, Farris sent Sullivan a memo contesting his 1988 commissions. In June, 1989, Farris again expressed his discontent over his 1988

commissions and this time, his comments were sent to each committee member. The only response Farris received was from Torson on November 14, 1989 in which he stated that he continued to disagree with Farris about the DCX bonus. Torson did not address the M & M commission.

Where, as here, a company establishes specific internal procedures to informally resolve disputes and an employee follows those proscribed procedures, public policy should not penalize him by precluding a judicial remedy when the company fails to be responsive. Moreover, the courts should encourage employees to seek alternative dispute resolutions which are less costly, time consuming and adversarial than the judicial process. Therefore, ITT's public policy argument is without merit and is particularly unjustified here.

Because Ferris' § 8–4–104 claim accrued when he was terminated from ITT in February 1992 and his wage act claim was filed on July 23, 1992, it is timely. Accordingly, ITT's summary judgment motion seeking to bar this claim on statute of limitation grounds is denied.

### B) FARRIS' COMMON LAW CLAIMS

ITT also seeks summary judgment on Farris' common law claims. ITT contends that under choice of law principles, California law is applicable here and, therefore, liability for Farris' termination is precluded because it resulted from a work force reduction. ITT further argues that in any event, Farris can not recover damages for emotional distress. Farris counters that Washington or Colorado law controls so summary judgment should be denied.

As a federal court sitting in diversity, I must apply the choice of law principles of the forum state. *Meehan v. Amax Oil & Gas, Inc.,* 796 F.Supp. 461, 465 (D.Colo.1992). Colorado has expressly adopted the Restatement (Second) Conflict of Laws (1971) for contract actions. ITT contends that Section 188 of the Restatement (Second) should be applied, while Farris argues that section 196 is most applicable. However, under either analysis, Washington law controls.

The objective of the Restatement (Second) is to locate the state having the "most significant relationship" to the particular issue. *Wood Bros. Homes, Inc. v. Walker Adjustment Bureau,* 198 Colo. 444, 601 P.2d 1369, 1372 (1979). ITT contends that section 196 is inapplicable because more than one state is involved and the regional manager's position requires travel between states. Section 196 applies to contracts for the rendition of services. It provides:

> The validity of a contract for the rendition of services and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

> Restatement (Second) of Conflict of Laws, p. 623 (1971).

Comment (a) to this section notes that this rule is unlikely to be helpful when the contract services can be performed in any one of two or more states. However, Comment (b) states that the place where the services or a major portion are rendered enjoys the greatest significance when the work is more or less stationary and extends over a considerable time period.

Here, Farris' work in Seattle was mostly stationary. His primary responsibility was servicing Boeing's Seattle account. Moreover, Farris accepted this position with the expectation that he would remain in Seattle for a minimum of two to three years. He also had promotional expectations which would have effectively extended his Washington stay indefinitely. Farris' position could not, as ITT now contends, be performed in any one of two or more states. Moreover, while Farris' employment may have included some travel outside Washington, the majority of time was spent in Seattle. Because comment (a) does not negate section 196's application here and Farris' common law claims concern a service contract, section 196 provides the appropriate choice of law rule.

Section 196 creates a presumption that the state where services are performed is the state having the most significant relationship to the contractual issues. *Wood Bros. Homes, Inc. v. Walker Adjustment Bureau*, 601 P.2d at 1373. The presumption is not conclusive. *Id.* If another state has a more significant relationship, then that state's law will be applied. *Id.* Since Farris performed his agreed services for ITT in Seattle and he moved there with expectations of promotional opportunity in Seattle, there is a presumption that Washington is the state with the most significant relationship to the Farris' common law claims. ITT offers no arguments under section 6 of the Restatement (Second) to rebut this presumption. Therefore, this presumption is unrebutted and Washington law controls.

Assuming arguendo Restatement (Second) § 188 is applied rather than § 196, the same conclusion is reached. Section 188 provides, in relevant part, that to determine the state with the most significant relationship, the following contacts should be considered:

a) the place of contracting,

b) the place of negotiation of the contract,

c) the place of performance,

d) the location of the subject matter of the contract, and

e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

Restatement (Second) of Conflicts of Laws, § 188 (1971).

As to contracting, ITT contends that the place of contracting was California, while Farris argues it was Colorado. I agree with Farris because he was in Colorado when he accepted ITT's offer. Comment (e) to section 188 provides that the place of contracting is the place where the last act necessary, under the forum's rule of offer and acceptance, occurred to give the contract binding effect. Here, the parties agreed to the contract terms during the California meetings in early June, 1988. Thereafter, Farris returned to Colorado and discussed the contract terms with his wife. Farris then accepted the Seattle position by telephoning Myers from Colorado. Since this last act of acceptance (Farris' telephone call) occurred in Colorado, the place of contracting is Colorado.

The second factor, the place of contract negotiations, is both California and Colorado. ITT contends it is only California, while Farris concedes that negotiations took place in both California and Colorado. Myers first discussed Farris' concerns and his resignation by telephone when Farris was in Colorado. Shortly thereafter, Myers flew to Colorado specifically to discuss Farris' future with ITT. ITT contends that these conversations were not "negotiations". However, it offers no evidence to support this argument. These discussions were directly in response to Farris' resignation. Hence, they constitute negotiations. The subsequent conversations between Myers, Sullivan and Farris in California were also negotiations since the specific terms of the agreement were formulated there. Because negotiations took place in more than one state, the place of negotiations is both California and Colorado.

The third factor, the place of performance, is Washington. Farris agreed with ITT to take the lateral position in Seattle for two to three years to secure the regional manager's position which he believed would be Seattle based. The only California connection was that the regional position was ultimately based there rather than Seattle. Since Farris performed his services entirely in Seattle and he believed that the promised promotion was to be Seattle based, Washington is the place of performance.

The next factor, the subject matter location, also points to Washington. The Restatement (Second) provides that the location of the risk to the party determines the contract's situs. Restatement (Second) of Conflict of Laws, § 188, comment on subsection (2). Here, Farris' risk was that ITT would not promote him in Washington. Since this risk was Washington based, the subject matter location is Washington.

The last factor, the parties' location, implicates California, Colorado and Washington. Farris was a Colorado domiciliary and resident when the June 1988 negotiations took place. Farris was again a Colorado resident when he was laid off in 1992. In the interim, he moved his domicile to Washington to continue working for ITT. ITT is incorporated

in Delaware, has its principal place of business in California, and conducts business throughout the United States. Consequently, the parties' location is spread among three states, California, Colorado and Washington.

■ In considering these five factors, I conclude that Washington is the state with the most significant contacts to Farris' common law claims. Colorado is a close second. Once the state having the most significant relationship is identified, that state's law is applied to resolve the underlying substantive issues. *Wood Bros. Homes, Inc. v. Walker Adjustment Bureau,* 601 P.2d at 1372.

■ ITT moves for summary judgment solely on the premise that if California law is applicable, Farris' common law claims are precluded. Since Washington law is applicable under choice of law principles, ITT's motion for summary judgment on Farris' common law claims is denied. ITT has not briefed the effect that Washington law would have on Farris' claims so I decline to address that issue here.

### III. MRS. FARRIS' CLAIM

Mrs. Farris alleges claims for promissory estoppel and breach of covenant of good faith and fair dealing based on ITT's promises to her that Farris would be promoted. ITT contends that these claims should be dismissed under Colorado or California law because case law fails to support extending or applying these claims to nonemployees.

■ Again, a conflict of law analysis is necessary. ITT contends that either Colorado or California law controls. Mrs. Farris argues that Colorado is applicable. At all times, Mrs. Farris resided and was domiciled in Colorado, all the conversations that she had with ITT management employees took place in Colorado, and to the extent she relied on any ITT promises, that reliance occurred in Colorado. The ITT personnel who Mrs. Farris spoke with concerning her husband were located in other states, usually California. Here, the contact factors overwhelmingly favor the application of Colorado law because Colorado has the most significant relationship to ITT's relationship with Mrs. Farris. Consequently, I will apply Colorado law.

Mrs. Farris contends that she brings her claims based on ITT's relationship with her, not her husband. Mrs. Farris argues that she expected that her performance would assist in obtaining a benefit which she sought both for herself and her husband. In her response, Mrs. Farris relies on section 90 of the Restatement (Second) of Contracts and *Malarkey Asphalt Co. v. Wyborney,* 62 Wash.App. 495, 814 P.2d 1219 (1991).

■ To assert a breach of the covenant of good faith and fair dealing, there must be an underlying contract. *Friedman v. Colorado Nat. Bank of Denver,* 825 P.2d 1033, 1042 (Colo.App.1991) (Colorado recognizes that the covenant of good faith and fair dealing is implied in every contract); *See also* Restatement (Second) of Contracts, § 205 (1981). Here, no contract existed between Mrs. Farris and ITT because the evidence, viewed in a light most favorable to Mrs. Farris and drawing all reasonable inference in her favor, fails to prove that Mrs. Farris provided ITT with consideration. *Fletcher v. Garrett,* 167 Colo. 60, 445 P.2d 401 (Colo.1968). An agreement not supported by consideration is invalid and unenforceable. *City of Arvada v. Concrete Contractors, Inc.,* 628 P.2d 170 (Colo.App.1981). Since any agreement between ITT and Mrs. Farris is unenforceable for lack of consideration, Mrs. Farris' breach of implied covenant of good faith and fair dealing must fail. Simply put, there is no underlying contract upon which to rest Mrs. Farris' covenant breach claim. Moreover, *Malarkey* is distinguishable. Unlike here, in *Malarkey* the existence of a contract was undisputed. The wife in that case was defendant's employee and she was fired with her husband. In any event, *Malarkey* is a statement of Washington, not Colorado law.

Because a contract is required to sustain a claim for breach of the covenant of good faith and fair dealing and no contract existed here as a matter of law, Mrs. Farris' claim is not cognizable. Accordingly, ITT's motion to dismiss Mrs. Farris' claim for breach of the covenant of good faith and fair dealing is granted.

■ Mrs. Farris has, however, offered sufficient evidence to support her promissory

estoppel claim. The doctrine of promissory estoppel as articulated in the Restatement (Second) of Contracts § 90 is part of Colorado's common law. *Kiely v. St. Germain,* 670 P.2d 764, 767 (Colo.1983). Section 90 provides:

A promise which the promisor should reasonable expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

While there is no case law applying the doctrine of promissory estoppel to facts similar to those here, Mrs. Farris has offered sufficient evidence for a reasonable jury to find in her favor on her promissory estoppel claim. Accordingly, ITT's motion to dismiss this claim as a matter of law is denied.

Accordingly, IT IS ORDERED THAT ITT's summary judgment motion is granted as to Mrs. Farris' claim of breach of the covenant of good faith and fair dealing and denied on all other issues.