**Terry INGRAM, Plaintiff**

v.

**RENCOR CONTROLS, INC., Defendant**

**No. CIV.02–58–P–C.**

United States District Court,
D. Maine.

April 11, 2003.

Timothy J. Bryant, Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Portland, ME, for Terry J Ingram, Plaintiff.

Daniel J. Mitchell, Bernstein, Shur, Sawyer, & Nelson, Portland, ME, Frederick C. Moore, Robinson, Kriger, McCallum & Greene, P.A., Portland, ME, John T.

Casey, Jr., Albany, NY, for Rencor Controls Inc, Defendant.

## MEMORANDUM OF DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GENE CARTER, Senior District Judge.

Now before the Court is the Motion for Summary Judgment of Defendant Rencor Controls, Inc. ("Rencor"). Defendant contends that there is no genuine issue of material fact with regard to Plaintiff Terry Ingram's ("Mr.Ingram") claims for breach of contract and unjust enrichment and that Defendant is entitled to judgment as a matter of law.

### I. PROCEDURAL HISTORY

The claims now pending before this Court in the instant Motion for Summary Judgment are those that survived Defendant's Motion to Dismiss (Docket Item No. 3) in an order by this Court affirming the Magistrate Judge's recommendation to grant in part and deny in part Defendant's Motion to Dismiss. *See Ingram v. Rencor Controls,* 217 F.Supp.2d 141, 150 (D.Me. 2002); Order Affirming the Recommended Decision of the Magistrate Judge ("Recommended Decision") (Docket No. 14). Plaintiff's First Amended Complaint and Demand for Jury Trial ("Complaint") (Docket Item No. 6) alleges four counts. Count I alleges breach of contract with respect to both an oral agreement to pay Plaintiff a bonus for his work in 2001, and an agreement to issue him 10% of the company's stock as part of a package to entice him to remain with the company. Count II pleads unjust enrichment as an

alternative theory of recovery, and is thus based on the same promises allegedly made to Plaintiff that form the basis of the breach of contract claims. Count III asserts a claim for unpaid compensation under 26 M.R.S.A. § 626, and Count IV asserts a promissory estoppel claim.

Upon the recommendation of the Magistrate Judge, this Court dismissed as a violation of the Statute of Frauds that portion of Count I claiming the bonus. *See Ingram,* 217 F.Supp.2d at 150. It also dismissed the promissory estoppel claim in Count IV. *See id.* at 153. Surviving the Motion to Dismiss and, therefore, currently before this Court are (1) the contract claim for the stock transfer and in the alternative, the unjust enrichment claim for the same and (2) the unjust enrichment claim for the bonus. Plaintiff's damages claim for unpaid compensation under M.R.S.A. § 626 in the form of stock also still stands, but it is conditional upon a finding that Plaintiff is contractually entitled to the stock.[1] Finally, also remaining for this Court to decide is whether these claims should be resolved under Maine law or New York law.

### II. FACTS

Plaintiff Terry Ingram, a resident of Maine, began working for Defendant Rencor in 1994. Complaint ¶¶ 1, 11; Defendant's Statement of Material Facts ("Defendant's SMF") (Docket Item No. 22) ¶ 11. Defendant Rencor, a New York corporation with a principal place of business in Fort Edward, New York, sells commercial valves to the pulp and paper industry. Complaint ¶ 8. Plaintiff, retained as an at-will employee with no written contract, was hired as a regional sales representa-

---

1. In the Recommended Decision adopted by this Court, the Magistrate Judge dismissed that part of the claim for damages under 26 M.R.S.A. § 626 seeking the bonus, based on the finding that Plaintiff was not contractually entitled to that bonus. *See Ingram,* 217 F.Supp.2d at 152.

tive for the "Maine territory," covering Maine, Vermont, New Hampshire and part of Massachusetts, with the majority of work being done in Maine. Defendant's SMF ¶ 17; Plaintiff's Statement of Additional Disputed Material Facts ("Plaintiff's SDMF") (Docket Item No. 40) ¶ 6. In his position at Rencor, Mr. Ingram was to maintain and grow the business in Maine, specifically by increasing sales, bringing in employees, and managing the office. Plaintiff's SDMF ¶ 10. Plaintiff would generate orders from customers in the Maine territory and then prepare quotes for those orders in Maine. Id. ¶ 11.

When Plaintiff joined Rencor in 1994, the sole shareholders of the company were Patrick Herlihy, the president of Rencor, owning 55% of the stock, and Corey Simpson, owning 45% of the stock. Defendant's SMF ¶ 10. In September of 1997, Corey Simpson quit his employment at Rencor. Id. ¶ 23; Plaintiff's SDMF ¶ 16. Plaintiff, concerned about the viability of the company following Mr. Simpson's resignation, was himself considering leaving Rencor. Plaintiff's SDMF ¶ 17. Mr. Herlihy, however, seeking to keep Plaintiff employed by Rencor with Mr. Simpson now gone, had discussions with Plaintiff as to the conditions under which he would continue on in his employment with Rencor. Id. ¶¶ 17–18. The parties agree that these discussions occurred within several days of Mr. Simpson's resignation, Defendant's SMF ¶ 39, Ingram Depo. at 22:22–23; however, they dispute exactly where these discussions took place. Plaintiff alleges that the discussions took place face to face, in Rencor's New York offices. Plaintiff's SDMF ¶ 20; Deposition of Terry Ingram ("Ingram Depo.") at 22:17–23; 24:21–24; 32:8–11; 36:23–37:6. Mr. Herlihy claims that the parties had two discussions on this issue, each over the phone, about one week apart. Plaintiff's SDMF ¶ 19.

Regardless of where and by what medium these discussions took place, however, it is undisputed that Plaintiff advised Mr. Herlihy that he would stay at Rencor only if he received a salary increase of more than 50%, a corporate officership, and a 10% share of stock in the company. Defendant's SMF ¶¶ 30, 32. The parties then agreed that Rencor would raise Mr. Ingram's salary to $100,000 and would promote him to vice president if he stayed with the company. Plaintiff's SDMF ¶ 22. Mr. Herlihy also communicated to Plaintiff that he felt a transfer of 10 % of the shares in Rencor "was a fair amount." Id. ¶ 31; Ingram Depo. 24:22–23; Deposition of Patrick Herlihy ("Herlihy Depo.") 72:18–24. In exchange, Plaintiff agreed to remain employed with Rencor. Plaintiff's SDMF ¶ 24–25. According to Plaintiff, the raise, the promotion to vice president, and the delivery to him of 10% of the stock in the company comprised the entire agreement between himself and Mr. Herlihy, with no additional terms having been discussed. Defendant's SMF ¶¶ 32–33. Mr. Herlihy, on the other hand, while not disputing that he agreed to give Plaintiff a raise and promote him to vice president, asserts that the parties never reached an agreement on the stock transfer and that they only discussed the possibility of such a transfer. Id. ¶¶ 14, 15, 29, 45.

Notwithstanding the dispute as to the alleged underlying agreement, however, the parties do not dispute that they never memorialized any agreement in writing and that no notes were made. Id. ¶ 33. In fact, until the year 2000, there was no written correspondence of any kind between Mr. Ingram and Mr. Herlihy regarding any stock issuance to Mr. Ingram. Defendant's SMF ¶ 16. There is also no dispute that there was no discussion as to how long Plaintiff would remain with the company, but that Mr. Ingram understood

it was to be for a considerable length of time. *Id.* ¶¶ 35–36. However, Mr. Ingram testified that he did not know whether remaining employed for only a year would be too short a time to satisfy the agreement. *Id.* ¶ 37.

At the time of the alleged oral agreement in 1997 to transfer stock, both Mr. Ingram and Mr. Herlihy understood that the stock could not be issued to Mr. Ingram until the dispute with Corey Simpson was resolved. Defendant's SMF ¶ 46; Ingram Depo. 25:21–26:1, 27:10–16. When asked if any other details besides the increase in salary, promotion to vice president, and transfer of 10% of the company stock were discussed at the time of the alleged agreement, Terry Ingram replied: "the only detail was the issuing of the stock. That there was a delay that he could not issue me the stock at that time. But there was a commitment that when there was resolution from Corey's leaving that the stock would be issued directly after that." Ingram Depo. 25:22–26:1. Ingram testified that Mr. Herlihy indicated that his concerns about the inability to issue the stock at that time were due to the legal issues that had developed with Mr. Simpson. Plaintiff stated: "I remember him telling me that the—until Corey and him were cleaned up completely, it would make it very complicated to issue the stock until that point." Ingram Depo. 27:10–16.

Mr. Ingram further testified that his understanding at that time was that it would take about two years to resolve

matters with Mr. Simpson. Defendant's SMF ¶ 47; Ingram Depo. 159:14–19. He "absolutely" knew that litigation involving Rencor and Corey Simpson was a possibility. Defendant's SMF ¶ 46; Ingram Depo. 149:2–4. Mr. Herlihy also believed it would take at least two years to resolve the dispute with Mr. Simpson, because the two were "not communicating" and had reached a "complete impasse." Defendant's SMF ¶ 49; Affidavit of Patrick Herlihy ¶ 9.[2] In fact, Mr. Simpson's lawsuit against Rencor was not dismissed until July of 1999, and he did not redeem his Rencor stock until one year after that, in July of 2000. Plaintiff's SDMF ¶ 51.

Throughout their employment relationship, Mr. Herlihy and Mr. Ingram would meet on a yearly basis to discuss and fix the terms of Mr. Ingram's employment, specifically his salary and bonus eligibility, for the next year. *See* Plaintiff's Response to Defendant's SMF (Docket Item No. 40) ¶ 54. At their yearly meeting at the end of 2000, the parties met to discuss Mr. Ingram's compensation for the next year, and at that time discussed the possibility that he would obtain a bonus if he met his quota in 2001. Plaintiff's SDMF ¶ 66. Mr. Ingram claims that, specifically, the parties agreed that if the bottom line profit for the Maine territory in 2001 was higher than the bottom line profit for the Maine territory in 2000, he would be entitled to a bonus of $25,000, to be prorated over his paychecks in 2002. *See id.* ¶¶ 67–69; Defendant's SMF ¶¶ 86–87; Complaint ¶ 23. Defendant maintains that no such agree-

2. Although Plaintiff purports to deny paragraph 49 of Defendant's Statement of Material Facts, he does not, in fact, controvert the sworn affidavit of Mr. Herlihy. He asserts only that at the time of the parties' discussions, they "really did not know what was going to happen" with respect to Mr. Simpson's dispute with Rencor and that, at the time of their discussions, they did not know there was going to be litigation between Rencor and Mr. Simpson. Plaintiff's Responses to Defendant's Statement of Material Facts ("Plaintiff's Resp. to Def's SMF") (Docket Item No. 40) ¶ 49. These statements do not contradict Mr. Herlihy's statement that he expected whatever ensued between Mr. Simpson and Rencor to take at least two years to resolve. Herlihy Aff. ¶ 9.

ment was ever reached, that the parties only discussed the possibility of a bonus, and, at any rate, no agreement as to the amount of such a bonus was ever reached. Reply Statement of Material Facts Filed By Defendant in Support of Summary Judgment (Docket Item No. 48) ¶¶ 67, 69; Plaintiff's SDMF ¶ 68. The parties do agree, however, that Defendant did raise Plaintiff's salary in 2001 to $125,992 (up from $102,131 in 2000), an increase of approximately 25%. *See* Defendant's SMF ¶¶ 66, 90. On or about January 31, 2002, Mr. Ingram resigned as Vice President of Rencor. Defendant's SMF ¶ 72. In March of that year, he instituted the present lawsuit.

### III. STANDARD OF REVIEW

Summary judgment is appropriate where there exists no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. FED. R. CIV. P. 56(c). An issue is "genuine" if a jury, drawing inferences favorable to the non-moving party, could reasonably resolve it in favor of that party. *See Ward v. Massachusetts Health Research Inst., Inc.* 209 F.3d 29, 32 (1st Cir.2000) A fact is "material" if it could affect the outcome of the case under the governing law if the dispute over that fact is resolved favorably to the nonmovant. *McCarthy v. Northwest Airlines,* 56 F.3d 313, 315 (1st Cir.1995) (citations omitted). The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Nicolo v. Philip Morris, Inc.,* 201 F.3d 29, 33 (1st Cir.2000). The burden of production then

shifts to the nonmovant, who, to avoid summary judgment, must establish the existence of a question of fact that is both "genuine" and "material." *Desmond v. Varrasso (In re Varrasso),* 37 F.3d 760, 763 (1st Cir.1994) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

### IV. DISCUSSION

Defendant Rencor argues that no agreement was ever reached to provide Plaintiff with a 10% share in the company. Defendant argues that even if the parties had reached such an agreement, it would violate the Statute of Frauds and be unenforceable as a matter of law. Defendant further argues that Plaintiff is not entitled to compensation on an unjust enrichment theory, and that Plaintiff's claim for damages under 26 M.R.S.A. § 626 is barred. In order to decide these arguments, the Court must first determine the state law that will govern. After this determination has been made, the Court will address in turn each of Plaintiff's claims.

#### A. Choice of Law

■ In a diversity case where state-law claims are at issue, the federal court must apply the choice-of-law rules of the state in which it sits. *See Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 491, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Burr v. Melville Corp.,* 868 F.Supp. 359, 363 (D.Me.1994). "The state of Maine generally follows the Restatement (Second) of Conflicts in determining choice-of-law issues." *GMAC Commer. Mortg. Corp. v. Gleichman,* 84 F.Supp.2d 127, 133 (D.Me. 1999) (citation omitted). Under the RESTATEMENT (SECOND) OF CONFLICTS, the court must determine what state has the "most significant relationship to the transaction and parties." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(1) (1971)

("RESTATEMENT"). Section 6(2) of the RE-STATEMENT enumerates factors to consider in general conflicts analyses. Section 188(2) of the RESTATEMENT provides factors for the choice-of-law analysis in a contract case, and section 196 sets forth an analytic framework for service contracts in particular. *See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.,* 188 F.Supp.2d 115, 118 (D.Mass.2002).

### 1. Section 196—Service Contracts

Section 196 of the RESTATEMENT applies to contracts for the rendition of services. Section 196 states that such contracts are governed by "the local law of the state where the contract requires that the services, or a major portion of the services, be rendered," unless some other state has a stronger connection to the parties or transaction at issue under the considerations enumerated in Restatement section 6(2).[3] RESTATEMENT § 196. "The rendition of the services is the principal objective of the contract, and the place where the services, or a major portion of the services, are to be rendered will naturally loom large in the minds of the parties .... The state where the services are to be rendered will also have a natural interest in them and indeed may have an overriding interest in the application to them of certain of its regulatory rules." RESTATEMENT § 196 cmt. c. "[T]he place where the major portion of the services is to be rendered ... is the contact that will be given the greatest weight in determining, with respect to most issues, the state of the applicable law." RESTATEMENT § 196 cmt. b.

In this case, the alleged oral employment contract between Plaintiff and Defendant called for Plaintiff to cover the "Maine territory" in carrying out his duties as a sales representative on behalf of Rencor. Defendant's SMF ¶ 17. Although the "Maine territory" encompassed Vermont, New Hampshire, and parts of Massachusetts as well as Maine, it is undisputed that 40% of Plaintiff's sales were in Maine, *id.* ¶¶ 17, 20, and that none of Plaintiff's sales or any of his sales efforts were in New York. Plaintiff's SDMF ¶ 9. Plaintiff was based in Maine, and "the overwhelming majority of his time was spent selling in Maine." *Id.* ¶ 6. Certainly, as between Maine and New York, there is no question that Maine has much greater contact with the performance of this alleged contract, and there is no claim that New Hampshire or Vermont law should apply; therefore, under Restatement Section 196, Maine law applies to this action.[4]

---

**3.** The factors listed in section 6(2) are:
    (a) the needs of the interstate and international systems,
    (b) the relevant policies of the forum,
    (c) the relevant policies of other interested states in the determination of the particular issue,
    (d) the protection of justified expectations,
    (e) the basic policies underlying the particular field of law,
    (f) certainty, predictability and uniformity of result, and
    (g) ease in the determination and application of the law to be applied.
RESTATEMENT § 6(2).

**4.** The Court notes the similarity between this case and that of *Farris v. ITT Cannon, Div. of ITT Corp.,* 834 F.Supp. 1260 (D.Colo.1993), where the court applied section 196 to decide the choice-of-law question. *Id.* at 1266. In *Farris,* the plaintiff, a former sales representative of defendant California corporation, sued his former employer for breach of contract. The court rejected defendant's argument that California law should apply and, applying RESTATEMENT Section 196 found that the law of the state of Washington applied where plaintiff employee, although traveling some outside of Washington, performed the majority of his agreed services as a sales representative for defendant in the state of Washington. *Id.* at 1267.

2. Section 188—General Choice–of–Law Considerations in a Contract Case

Section 188(2) sets out five factors to employ in determining which state has the greater relationship to an alleged contractual agreement: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *See Maine Surgical Supply Co. v. Intermedics Orthopedics, Inc.*, 756 F.Supp. 597, 600 (D.Me.1991); RESTATEMENT § 188(2). These contacts are to be evaluated according to their relative importance with respect to the particular issue. RESTATEMENT § 188(2).

The first, second, and fifth factors in this case do not serve to provide definitive aid to the Court in its choice-of-law determination. The first two factors, the place of contracting and the place of negotiation of the alleged oral contract, are both disputed in this case. Plaintiff testified that he went to New York and met with Mr. Herlihy, and that that is where they reached their agreement. Plaintiff's SDMF ¶ 20; Ingram Depo. at 24:21–24; 32:8–11; 36:23–37:6. However, as Plaintiff points out, Mr. Herlihy testified that any discussions concerning the alleged agreement took place over the telephone, with Mr. Herlihy in New York and Mr. Ingram in Maine, and that the two never met in person. Plaintiff's SDMF ¶ 19 (*citing* Herlihy Depo. at 64:22–65:5; 66:3–5; 74:13–15). With such a clear dispute of fact concerning these two elements, the Court cannot make any finding as to them for summary judgment purposes. The fifth factor, that of the domicile or place of incorporation and place of business of the parties, is also not helpful because Plaintiff works and lives in Maine, Complaint ¶ 1, Plaintiff's SDMF ¶ 6, while Defendant is incorporated and has its principal place of business in New York. Defendant's SMF ¶¶ 1, 3.

It is the third RESTATEMENT factor, the place of performance, that the Court finds to be dispositive. "The state where performance is to occur under a contract has an obvious interest in the nature of the performance and in the party who is to perform." RESTATEMENT § 188(2) cmt e. With regard to this factor, the factual record indicates that the state of Maine has the more significant relationship with the contract at issue. Regardless of where the alleged contract was made or negotiated, as pointed out above in the discussion of section 196, any agreement was for Plaintiff to perform his services in the Maine territory. He was to maintain and grow the business in Maine by increasing sales, hiring employees, and managing the office in Maine. Plaintiff's SDMF ¶ 10. Further, the preparation of quotes for orders placed by customers was done in Maine. *Id.* ¶ 11. Maine is where any alleged contract was performed and therefore, Maine, rather than New York, has the more significant relationship to the alleged contract under this factor.[5]

---

5. In *Maine Surgical*, 756 F.Supp. 597, this Court conducted a choice-of-law analysis under section 188(2). Instead of conducting a separate analysis under section 196, it employed the latter section as guidance in determining the place of performance under section 188(2)'s third factor. Nevertheless, under either way of approaching the analysis, there, as here, both provisions point to the application of Maine law. *See Maine Surgical*, 756 F.Supp. at 601 (finding Maine law applied where Plaintiff distributor of Defendant Texas corporation's medical supply products conducted duties from the former's place of business in Maine and distributed products to entities in Maine, Vermont, and New Hampshire; Plaintiff's services were rendered under alleged contract "in relevant part" in Maine).

The remaining factor under section 188(2) is the location of the subject matter of the contract. This factor also points to Maine, and bears little discussion. Simply, the alleged contract at issue was a contract for the performance of services and, as previously discussed, the services were to be performed predominantly in Maine. Therefore, the location of the subject matter of the contract—Mr. Ingram's contracted-for sales activities on behalf of Defendant—is Maine.[6] Under RESTATEMENT Section 188(2), the law of the state of Maine is the appropriate choice of law.

### 3. Section 6(2)

The factors to consider under RESTATEMENT Section 6(2) in conducting a general choice-of-law analysis are as follows:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Applying Maine law does not thwart the purposes of section 6(2). In fact, doing so particularly *advances* these goals. In a contract case, the protection of the justified expectations of the parties is of considerable importance. It is, in fact, "the basic policy underlying the field of contracts." RESTATEMENT § 188 cmt. b. Protecting these justified expectations, in turn, gives importance to the values of certainty, predictability, and uniformity of result. *See id.* Choosing the law of the place where the majority of the services are to be rendered "furthers the choice-of-law values of certainty, predictability and uniformity of result and, since the place where the contract requires that the services, or a major portion of the services, are to be rendered will be readily ascertainable, of ease in the determination of the applicable law." RESTATEMENT § 196 cmt. c. Recently, the United States District Court for the District of Massachusetts convincingly expounded the merits of applying the law of the state where the services are to be performed:

> Looking to the law of the place where services are to be provided, instead of the place where the contract was formed, better meets the needs of an interstate system because where the services are provided bears a closer relationship to the totality of the parties' expectations than does the merely fortuitous location of execution. Moreover, the place of performance is usually capable of ready ascertainment and therefore does not necessarily deprive the parties of the certainty, fairness, and predictability that they seek in forming a contract. The parties retain the option of selecting ex ante the law of a particular forum that will govern their relationship.

*Daynard,* 188 F.Supp.2d at 122.

Finally, it is axiomatic that the state where a contract is performed would have

---

**6.** In their Motion for Summary Judgment, Defendants argue that because the stock certificates are located in New York and the issuance of those stock certificates would have to occur in New York, New York law should be applied. However, as discussed above, Plaintiff's solicitation of sales in the Maine territory is the purpose of the contract the manner in which he is paid is secondary, and should not govern the choice of law. This effort to contort the purpose of this contract to involve the application of New York law is without merit.

an interest in any dispute about issues arising from that contract. The State of Maine has a legitimate interest in seeing that the present action, involving one of its citizens and work carried out within its boundaries, is resolved fairly and justly. Although New York might also have an interest given that one of the parties is a New York resident, it does not outweigh the interest of the State of Maine. In sum, under any way of analyzing the choice of law issue under the RESTATEMENT, the Court finds it appropriate to apply Maine law to the present action.

## B. The Contract Claim

Count I of Plaintiff's Complaint alleges breach of contract. Plaintiff contends that Defendant breached an oral agreement entered into in 1997 whereby Defendant orally agreed to issue Plaintiff 10% of the company's stock in exchange for Plaintiff's agreement to continue to work for Rencor. Complaint ¶¶ 32–33. Defendant claims that Plaintiff's claim for breach of contract should fail and cites three independent bases for this assertion. Defendant argues (1) that the alleged oral contract is barred by the Statute of Frauds, (2) that there was no meeting of the minds, and (3) that the alleged contract is unsupported by valid consideration. Motion for Summary Judgment at 2. Although it is arguable that there was no meeting of the minds on this alleged contract, even if there was such a meeting of the minds, the Court finds that this contract falls within the Statute of Frauds and is, therefore, unenforceable. Because the Court finds that under Maine law the alleged contract is barred by the Statute of Frauds and is, therefore, unenforceable, the Court will address only Defendant's first argument.

Under Maine law,

[n]o action shall be maintained in any of the following cases:

.    .    .    .    .

5. Agreement not to be performed within one year. Upon any agreement that is not to be performed within one year from the making thereof;

.    .    .    .    .

unless the promise, contract or agreement on which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith, or by some person thereunto lawfully authorized . . . .

33 M.R.S.A. § 51.

■ When the parties to an oral contract do not expressly state that the contract is to be performed within one year, the court must discern the intent and understanding of the parties from the circumstances surrounding the contract and its making and the situation of the parties. *See Larson v. Johnson,* 184 F.Supp.2d 26, 33 (D.Me.2002) ("When it appears to have been understood by the parties to an oral contract that it was not to be performed within a year [ ] the contract [is] within the Statute of Frauds"); *see also Great Hill Fill & Gravel v. Shapleigh,* 692 A.2d 928, 929 (Me.1997); *White v. Fitts,* 102 Me. 240, 66 A. 533, 537 (1908). Furthermore, the mere possibility that a contract may be performed within a year does not serve to remove it from the Statute of Frauds—it is the intent of the parties as to when the contract shall be performed that determines whether the bar will apply. *See Longcope v. Lucerne–In–Maine Community Ass'n,* 127 Me. 282, 143 A. 64, 65 (1928).

■ Mr. Ingram and Mr. Herlihy, at the time of the alleged agreement, did not discuss how long it would take for Rencor to transfer the shares of stock to Mr.

Ingram.[7] However, Mr. Ingram knew when he broached the subject of leaving Rencor with Mr. Herlihy that there were problems with Mr. Simpson; in fact, it was his fears for the viability of the company following Mr. Simpson's departure that prompted his discussions with Mr. Herlihy in the first place. Plaintiff's SDMF ¶ 17. Plaintiff admitted in his deposition testimony that at the time of his original agreement with Mr. Herlihy, Mr. Herlihy informed him that the stock could not be issued to him at that time because of the legal issues that were going on with Mr. Simpson. Ingram Depo. 25:22–24; 27:10–16. He testified that Mr. Herlihy did promise him that when the matters resulting from Simpson's departure were resolved, the stock would be issued to him. *Id.* 25:24–26:1. When Mr. Ingram was directly asked what his understanding was at the time of the original agreement as to how long it would take to resolve matters with Mr. Simpson, his response was clear. He plainly stated that he believed this process would take "about two years." Ingram Depo. 159:14–17.

Although the Plaintiff attempts to create disputes of fact with regard to this issue in arguing that all of the "conditions," extra "strings," and "bells and whistles," Ingram Depo. 31:24–32:13, were attached to the stock transfer after the original agreement, and that these were all additional conditions that he never agreed to, the record reveals that such extra conditions alleged by Plaintiff to have been belatedly broached include such particulars as a buy-sell agreement, a written non-compete employment contract, and rules as to how the stock would be sold back and forth, etc. Ingram Depo. 32:14–19.[8] The record does *not* reveal that there was a later condition that the stock could not be transferred until the dispute with Mr. Simpson was resolved. According to the undisputed record, *that* condition was part of the original understanding and was not modified or attempted to have been modified by later discussions.

Even if the parties had reached an agreement on the 10% stock transfer, the parties' mutual understanding at the time they allegedly made such agreement was that the stock transfer could not happen

---

7. The parties also did not discuss how long Mr. Ingram would remain employed at Rencor pursuant to their agreement. However, because Plaintiff stated in his deposition that he did not know if remaining employed for only one year would be too short, Defendant's SMF ¶ 37, it cannot be affirmatively determined that the intent of the parties was for Plaintiff's performance to require more than one year. Therefore, in order to determine whether the agreement violates the Statute of Frauds, the Court must focus on the parties' intentions regarding *Defendant's* time for performance, which, from the record, can be discerned.

8. Plaintiff also tries to create a dispute of fact by pointing out that at the time of the alleged agreement, Mr. Herlihy did not know there was going to be litigation between Rencor and Mr. Simpson, and that Rencor had not yet received formal notification of Mr. Simpson's dissolution petition. Plaintiff's

Resp. to Def's SMF ¶ 7. He adds that both parties knew that Mr. Simpson had a dispute with Rencor, but that neither Mr. Herlihy nor Mr. Ingram really knew what was going to happen. *Id.* Just because they did not know the particulars as to how the dispute with Mr. Simpson was going to play out did not mean that they did not understand that whatever ensued would be substantial, and would take time, as both parties admitted they understood. Ingram Depo 159:17–19; Defendant's SMF ¶ 49; Affidavit of Patrick Herlihy ¶ 9. Plaintiff's attempts to qualify or deny many of Defendant's statements of fact do not serve to alter the undisputed nature of what Defendant sets out in these statements, supported by citations to the sworn testimony of Plaintiff in which he professed his *understanding* as to how long it would take to resolve matters with Mr. Simpson. *See, e.g.,* Plaintiff's Resp. to Def's SMF ¶¶ 46, 47, 49.

immediately and, in fact, could not happen until the issues and disputes resulting from Mr. Simpson's departure were resolved, a process that both parties anticipated would take approximately two years. Even if Plaintiff is correct in asserting that the other conditions on the stock transfer—the buy-sell agreement, the non-compete agreement, etc.—were added by Mr. Herlihy after the original agreement was made, that does not affect the parties' initial understanding that the stock transfer would have to wait for the resolution of the Simpson issues. Because the understanding of the parties was that this contract was not to be performed within a year, the contract falls within the Statute of Frauds and is unenforceable.

## C. The Unjust Enrichment Claim

■ Count II of Plaintiff's Complaint asserts a right to a bonus for the year 2001 under a theory of unjust enrichment. This Court has already dismissed the contractual claim for the bonus as a violation of the Statute of Frauds. *See Ingram*, 217 F.Supp.2d at 150. Because this Court has now dismissed the contractual claim for the 10% stock transfer, it will also assume that Plaintiff seeks the stock transfer under a theory of unjust enrichment. *See June Roberts Agency v. Venture Props.*, 676 A.2d 46, 49 n. 1 (Me.1996) (Plaintiff may make claim for both breach of contract and unjust enrichment because a fact finder may find that no contract exists and still award recovery for unjust enrichment.).

Under Maine law,

[t]o establish a claim for unjust enrichment, a party must prove (1) that it conferred a benefit on the other party; (2) that the other party had appreciation or knowledge of the benefit; and (3) that the acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain the benefit without payment of its value. *Howard & Bowie, P.A. v. Collins*, 759 A.2d 707, 710 (Me.2000) (internal quotation marks and citation omitted). Under Maine law, unjust enrichment is not available if the parties have dealt with their relationship through contract. *See Fed. Ins. Co. v. Maine Yankee Atomic Power Co.*, 183 F.Supp.2d 76, 83 (D.Me.2001).

The remedy of unjust enrichment describes recovery for the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay. The existence of a contractual relationship precludes recovery on a theory of unjust enrichment.

*Nadeau v. Pitman*, 731 A.2d 863, 866–67 (Me.1999) (citations omitted). *See also In re Wage Payment Litig.*, 759 A.2d 217, 224 (Me.2000); *June Roberts Agency*, 676 A.2d at 49 n. 1; *Lynch v. Ouellette*, 670 A.2d 948, 950 (Me.1996); *Top of the Track Assocs. v. Lewiston Raceways*, 654 A.2d 1293, 1296 (Me.1995).

■ However, also under Maine law, even if there is an express contract between the parties, if the contract has been rescinded, abandoned, or terminated, or if it is unenforceable or invalid, a party may still obtain an equitable remedy. *See Horton & McGehee, MAINE CIVIL REMEDIES* § 7–5(a) (1996). *See also GMAC Commercial Mortg. Co.* 84 F.Supp.2d at 143 n. 12 (D.Me.1999) (holding that if at trial it is found that no contractual relationship exists, party may be able to recover under unjust enrichment theory). Furthermore,

[t]he prevailing view is that where the services are rendered under an oral agreement which is unenforceable because within the statute of frauds, the value of the services may be recovered under an implied assumpsit when the

party receiving the services refuses to go on and complete performance of the agreement.

66 AM. JUR.2d RESTITUTION AND IMPLIED CONTRACTS § 85 (2001). *But see Abrams v. Unity Mut. Life Ins. Co.,* 237 F.3d 862 (7th Cir.2001) (applying New York law and finding that a claim of unjust enrichment may not be used to circumvent the statute of frauds; such a claim may be barred if it is based on the same promise and seeks the same relief as an otherwise barred contract claim.).

Thus, the controlling issue here is whether Mr. Ingram and Rencor had a contractual relationship that would prevent him from prevailing on a claim of unjust enrichment. More specifically, the question is whether Mr. Ingram, because of his broader contractual employment relationship with Rencor, is precluded from prevailing on a claim of unjust enrichment with regard to the particular terms of his employment compensation contract that this Court has found to be in violation of the Statute of Frauds and unenforceable. This issue is a difficult one, given the uneasy tension between the policy in Maine of allowing recovery for unjust enrichment when a party acts pursuant to an unenforceable contract and is not compensated and the rule that a contractual relationship between parties precludes recovery by one for unjust enrichment.

Mr. Ingram has been compensated in this case, and he has been compensated pursuant to a valid employment contract, albeit an oral one. Mr. Ingram admitted that he and Mr. Herlihy held discussions each year regarding the terms of Mr. Ingram's employment, specifically his salary and bonus eligibility. *See* Plaintiff's Response to Defendant's SMF ¶ 54.[9] Mr.

Ingram had agreed-upon duties that he performed each year; namely, to maintain and grow the business by increasing sales, bringing in employees, and managing the office, Plaintiff's SDMF ¶ 10, duties for which each year he received an agreed-upon salary. Plaintiff does not claim that he performed extra-contractual services not called for by the contract. *See Terry Barr Sales Agency v. All–Lock Co.,* 96 F.3d 174, 181 (6th Cir.1996) (citing principle that equitable remedies may be available where a legally enforceable contract exists between the parties when recovery is sought for extra-contractual performance); *see also McKay v. WilTel Commun. Sys., Inc.,* 87 F.3d 970, 977 (8th Cir.1996) (restitutionary recovery permitted for services outside scope of employment contract). Plaintiff does not argue that he did not receive his agreed-upon salary. Plaintiff argues only that he did not receive a bonus allegedly agreed to by the parties in 2001 and that he did not receive the stock transfer allegedly agreed to by the parties as part of the overall agreement in 1997 that included his promotion and a 50% increase in salary. The Court will discuss each of these two alleged agreements in turn.

### 1. The Stock Transfer

The alleged agreement to transfer the stock is a disputed term of the broader employment contract that was negotiated and entered into by Mr. Ingram and Rencor in 1997. Finding no First Circuit law on this discrete issue, the Court finds persuasive the reasoning of the Court of Appeals for the Sixth Circuit in *Terry.* In *Terry Barr,* Plaintiff, a sales representative company, and defendant, a lock manufacturing company, entered into an oral agency agreement whereby Plaintiff was

---

**9.** Plaintiff qualifies Defendant's statement of fact here, but only insofar as he maintains that he "never accepted any change to the parties' 1997 agreement with respect to the issuance of Rencor stock." Plaintiff's Response to Defendant's SMF ¶ 54.

to make sales to and/or obtain orders from automobile manufacturers for the purchase of Defendant's locks and latches for use in new automobiles. *Id.* at 176. In exchange, Plaintiff received a commission on sales to those customers. After Defendant terminated Plaintiff as its sales representative, Plaintiff indicated that it believed it was due commissions on continuing orders for parts it originally sold but were continued to be used by the buyer in the manufacture of its automobiles, a practice apparently common in the manufacturer's representative business. *Id.* at 176 n. 1. Defendant refused, arguing that this was not part of their original oral contract. Plaintiff then sued Defendant for breach of contract, unjust enrichment, and promissory estoppel. *Id.* at 176.

The parties in *Terry Barr* did not dispute that a contract existed between the two; what they did dispute, and vigorously so, was whether post-termination commissions were included as a term of the original agreement. *Id.* at 179. The Court of Appeals for the Sixth Circuit, while overturning the district court grant of summary judgment in favor of the defendant on the breach of contract claim because it found there was a dispute as to whether the parties intended for that term to be part of the contract,[10] noted that if the overall contract was found to be enforceable, where the parties "merely dispute [the] terms, scope, or effect" of a particular provision, a claim could not be made for unjust enrichment or promissory estoppel. *Id.* at 181.

In the case at hand, the parties do not dispute that they reached an agreement in 1997 to increase Plaintiff's salary by 50% and to promote him to Vice President. Plaintiff's SDMF ¶ 22. They do not dis-

pute that Plaintiff was, in fact, promoted and did, in fact, receive that raise, or that Plaintiff remained with Rencor as a regional sales representative. *Id.* ¶ 25; Defendant's SMF ¶ 30. They dispute only that the parties agreed to the allegedly enforceable term of this contract granting Plaintiff a 10% share in Rencor. This is not a case where the entire contract is found unenforceable and Plaintiff faces the prospect of receiving no compensation for considerable services performed. It is a case more closely analogous to that in *Terry Barr*, where the parties merely dispute one of the terms in an overall enforceable contract. Although it seems harsh to deny Plaintiff this form of compensation if, in fact, he was promised it, the Court cannot allow recovery "[w]here the parties have made a contract for themselves, covering the whole subject matter." *Maine Yankee*, 183 F.Supp.2d at 84 n. 12 (*quoting Prest v. Inhabitants of Farmington*, 117 Me. 348, 104 A. 521, 523–24 (1918)). Allowing recovery under a theory of unjust enrichment "would then be an impermissible end run around a voluntary structuring of relationships and their consequences." *Id.* at 85. Therefore, Plaintiff's claim of unjust enrichment with respect to the stock transfer fails.

### 2. The 2001 Bonus

Resolution of the question of whether Plaintiff can make an unjust enrichment claim for the alleged 2001 bonus is slightly more difficult given the facts in the record. However, engaging in only those inferences that are mandated by the record, the Court finds that the alleged promise to pay Mr. Ingram a bonus in 2002 for his work in 2001 was part of the overall agreement reached as a result of the regular yearly discussions between himself and Patrick

---

**10.** That is unlike this case, where the Court has found that regardless of any dispute over whether the terms at issue were intended to be part of the parties' agreement, such terms are in violation of the Statute of Frauds and are unenforceable.

Herlihy as to the next year's compensation package and, is therefore, unrecoverable on a theory of unjust enrichment.

The undisputed facts establish that Mr. Herlihy and Mr. Ingram held discussions each year regarding the terms of Mr. Ingram's employment, specifically his salary and bonus eligibility. *See* Plaintiff's Response to Defendant's SMF ¶ 54. The two discussed the possibility of a bonus in 2001 for Mr. Ingram at one of their annual meetings. *See* Plaintiff's SDMF ¶ 66; Defendant's SMF ¶¶ 86–87; Ingram Depo 56:3–25.[11] Clearly, the parties reached an agreement as to Plaintiff's salary for the year 2001, because his salary was increased from $102,131 in 2000 to $125,992 in 2001. *See* Defendant's SMF ¶¶ 66, 90.[12] The Court can safely assume that the regular yearly discussion between Mr. Ingram and Mr. Herlihy resulted in this nearly 25% salary increase for 2001 and that it encompassed the alleged oral agreement for the bonus to be paid out in 2002.

As such, the alleged agreement as to that bonus comprised one term of the employment contract setting Mr. Ingram's compensation for the year 2001. As stated above, a party cannot recover on an unjust enrichment claim when there is a contract between the parties governing this same subject matter. The parties now dispute one term of this otherwise enforceable contract, which means that a claim for unjust enrichment does not lie, and the parties are limited to what they may recover in contract. Because the term in question has been found to be barred by the Statute of Frauds, Mr. Ingram has no remedy as

to these particular terms. Because he is not left wholly uncompensated, the Court will not step in and exercise its equitable powers to afford relief as to one term of an otherwise enforceable contract voluntarily created by the parties to govern their employment relationship. Plaintiff's claim of unjust enrichment with respect to the 2001 bonus must also fail.

### D. The Claim For Enhanced Damages Under 26 M.R.S.A. § 626

Relief under 26 M.R.S.A. § 626 is available for compensation that is owed to an employee. *See Purdy v. Community Telecommunications Corp.* 663 A.2d 25, 28 (Me.1995) ("The employer's obligation is to pay the compensation owed within the time specified by the statute."). Section 626 is a statutory enforcement mechanism to ensure that employees are paid the wages that they are due under their employment contract once they no longer work for that employer. *See Community Telecommunications Corp. v. Loughran* 651 A.2d 373, 376 (Me.1994) ("Section 626 generally requires employers to pay employees the full amount of wages due on completion of employment."). Because this Court has found that, as a matter of law, Plaintiff has not shown that he is owed the stock transfer or the bonus under his employment contract with Rencor, he may not recover these sums under the statute.

### V. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendants' Motion for

---

11. In Plaintiff's deposition, he stated that the agreement was reached "at our annual meeting." The Court may reasonably infer that this "annual meeting" is one of the meetings that Plaintiff admitted took place between himself and Mr. Herlihy at the end of each year regarding the terms of his employment

for the following year. Defendant's SMF ¶ 54.

12. Again, Plaintiff qualifies paragraph 66 of Defendant's Statement of Material Facts, but he does not dispute that he received such a salary increase in 2001.

Summary Judgment be, and it is hereby, **GRANTED**.